UNITED STATES *v.* ESSO STANDARD OIL Co. (No. 4800)[1]

[1] C. A. D. 587.

United States Court of Customs and Patent Appeals, March 22, 1955

*Warren E. Burger*, Assistant Attorney General (*Richard E. FitzGibbon*, special attorney, of counsel), for the United States:
*Sharretts, Paley & Carter* (*Joseph F. Donohue* of counsel) for appellee.
*William. Whynman* and *Myron J. Burchard, amici curiae.*

[Oral agument October 12, 1954, by Mr. FitzGibbon, Mr. Donohue, and Mr. Whynman]

Before O'CONNELL, Acting Chief Judge, and JOHNSON and WORLEY, Associate Judges

O'CONNELL, Acting Chief Judge, delivered the opinion of the court:

This appeal brings before us for review a judgment of the United States Customs Court, First Division, entered pursuant to its deci-

sion, C. D. 1562, wherein a protest filed by appellee was sustained against the classification by the Collector of Customs at the port of New York of certain imported naphthenic acid.

The collector classified the merchandise and assessed it with duty under the provisions of paragraph 1 of the Tariff Act of 1930, reading:

Paragraph 1. Acids and acid anhydrides: * * * and all other acids and acid anhydrides not specially provided for, 25 per centum ad valorem.

The importer's claim, which the trial court sustained, is that the merchandise is entitled to free entry as a distillate obtained from petroleum under paragraph 1733, which reads:

Paragraph 1733. Oils, mineral: Petroleum, crude, fuel, or refined, and all distillates obtained from petroleum, including kerosene, benzine, naphtha, gasoline, paraffin, and paraffin oil, not specially provided for.

At the trial, the records of two previously decided cases involving the dutiable status of naphthenic acid were made part of the record herein: *United States* v. *Shell Eastern Petroleum Products, Inc.*, 26 C. C. P. A. (Customs) 132, C. A. D. 6; *Shell Eastern Petroleum Products, Inc.* v. *United States*, 28 C. C. P. A. (Customs) 155, C. A. D. 138. In all three of the cases thus presented, as properly noted by counsel for the Government, the involved merchandise was naphthenic acid; the classification thereof by the collector was made under paragraph 1; and the claim in the protest of the importer was asserted under paragraph 1733.

While there has been some question as to whether the material in issue is identical with that involved in the earlier cases, the processing steps by which the merchandise was produced were the same in all. The only difference is that in the instant case the fraction treated was the gas-oil fraction, while in the two previous cases it was the kerosene fraction. In all three cases, however, the main issue has been what actually happens chemically in those steps—and the significance, if any, of what does happen.

The following facts are disclosed by the record. It appears that naphthenic acid, as it is known to the trade, is in reality a group or series of acids, which have the empirically derived formula, $C_nH_{2n-2}O_2$, or $C_nH_{2n-1}COOH$, indicating that the substance is an organic acid.

Naphthenic acid is present to some extent in all crude petroleum, occurring most often in amounts less than one per centum, but sometimes as high as three to five per centum. In the few crudes having relatively high percentages of naphthenic acid, the acid, if not removed, will tend to make some of the products of petroleum less acceptable commercially. On the other hand, naphthenic acid is itself in demand as a constituent of paint dryer, or "napalm" (jellied gasoline), and of preservatives.

Naphthenic acid cannot be segregated, however, by the primary processing method of the industry, fractional distillation. Due to

the wide range of boiling points of the naphthenic acid, there is naphthenic acid present in nearly every fraction or cut in the distillation process. But, as the Government concedes in its brief, "naphthenic acid cannot be produced from petroleum by a process of distillation alone," and the record herein establishes that it is not so separated or isolated commercially by distillation.

Mechanical methods other than distillation for separating mixed but uncombined substances, such as settling, or filtration, are apparently ineffective. The method which appears to be universally used is one which we may characterize, generally, as a chemical process. Inasmuch as the significance of the pertinent steps in that process is the basic issue in this case, we shall at present endeavor to describe them briefly and as derived from the undisputed facts presented by the record. Consideration of the actual chemical reactions will be referred to hereinafter.

It appears that the petroleum fraction which contains the naphthenic acid is treated with a dilute sodium hydroxide (caustic soda) solution. The sodium hydroxide being a base neutralizes the naphthenic acid, and the naphthenic acid, generally speaking, may be said to "pass into" the solution. The solution, being heavier than the petroleum fraction, settles to the bottom of the container, where it is tapped off.

Next the solution is treated with dilute sulphuric acid, which "frees" the naphthenic acid from the solution. The solution and naphthenic acid are now separated by settling. The remaining solution is sodium sulphate and water.[1]

In other words, according to the record, we have described this process in terms of the actual steps taken therein:—a treating of a petroleum fraction with a solution of caustic soda; a mechanical separation of the solution from the fraction; a treating of the separate solution with sulfuric acid; and a final mechanical separation of naphthenic acid from the solution. In each of the three naphthenic acid cases, those identical steps were taken.

We proceed to a brief consideration of the history of the prior litigation, and of the contentions and holdings in the instant case.

In the first case, C. A. D. 6, the evidence tended to show that little more happened in carrying out the steps of the process than is outlined above. The court apparently viewed the applied process as one of mechanical separation or removal by solvent. In speaking of the material involved, the court said:

There is no dispute as to its inherent nature. It is an organic substance, present as such in many, if not all, crude petroleums. *Its nature was not altered by any*

---

[1] In the course of this chemical processing, some sodium naphthenate is first formed, and then decomposed. The extent and significance of this formation and decomposition are of major importance and will be discussed in proper order.

*chemical process. It was simply gotten by itself, or separated from other substances,* by procedure later herein described. [Emphasis added.]

In so viewing the process there described, the court found that there had been a simple segregation by the usual refining agents, and that therefore the naphthenic acid was a distillate obtained from petroleum, under the principles applied in *Borne Scrymser Co.* v. *United States,* 22 C. C. P. A. (Customs) 475, T. D. 47465. Later, this court, for reasons to be discussed, departed from its position in C. A. D. 6, and subsequently held that the naphthenic acid there involved could not be classified under paragraph 1733.

In the second case, C. A. D. 138, counsel for the Government sought to correct the court's misapprehension of the facts regarding the chemical changes involved in effecting the process. The importer in the second case introduced the record in the first case, and rested. The Government called one of the witnesses in the first case for further cross-examination, and called four new witnesses.

The court upon the new record thus made in the second case found that the evidence showed sodium hydroxide combines chemically with naphthenic acid to form sodium naphthenate and water; that the sodium naphthenate "is not contained in crude petroleum, and in the making of it naphthenic acid *is destroyed* by the chemical action" (emphasis added). The sodium naphthenate is then treated with sulfuric acid which causes a "chemical reaction" by which naphthenic acid is "created." To the claim that this was the *original* naphthenic acid, the court answered that—

a hydrogen atom * * * is withdrawn and never returned. It is also undisputed that * * * the hydrogen atom in sulphuric acid takes the place of the hydrogen atom that was destroyed, and thus a new naphthenic acid is produced.

The court in the second case gave its explicit reasons for reversing the first:

the judgment [in the first case] was based on a record that did not disclose fully the state of facts that is now before us in this case. Part of the record in [the first case] is controverted by testimony in this case, and other parts have been explained with a clarity that presents an entirely different view of the issue.

In this atmosphere the present case was instituted. At the trial, the importer took the testimony of several witnesses, including two professors of chemistry, with the obvious purpose of presenting a hitherto unconsidered theory of chemistry involved in the processing of naphthenic acid. This newly-advanced theory is that the sodium hydroxide produces a reversible chemical reaction or *equilibrium* with the naphthenic acid rather than a completed chemical reaction. Thus, instead of the notation of the court in the second case:

Fraction containing:

$$C_nH_{2n-1}COOH \quad + \quad NaOH \quad = \quad C_nH_{2n-1}COONa \quad + \quad H_2O$$

(naphthenic acid)      (sodium hydroxide)      (sodium naphthenate)      (water)

We have the following:

$$C_nH_{2n-1}COOH \quad + \quad NaOH \quad \rightleftarrows \quad C_nH_{2n-1}COONa \quad + \quad H_2O$$

The paired arrows shown above indicate an equilibrium reaction. It was testified further that the sodium naphthenate as dissolved in water ionizes to give a naphthenate ion and a sodium ion, while the water ionizes to give a hydroxyl (OH) ion and a hydrogen ion. Similar ionization occurs in sulfuric acid. What is meant by an equilibrium was described by appellant's witness Littman, a PhD. in chemistry, in the following language.

By Mr. Carter:

Q. In the course of your explanation, you have used the word equilibrium. Will you please explain what you mean by that?—A. I conceive of an equilibrium as a situation in which there is an apparent status quo of the over-all situation whatever it happens to be, but in which the individual constituents are in constant motion or in constant interchange with themselves. Perhaps I could illustrate that definition a little if we look at a glass of water. It looks to be perfectly quiescent as long as it is not being shaken and nothing can be seen in it. We know it is in equilibrium, but actually we know further that this water is composed of hydroxyl ions and hydrogen ions and undissociated molecules and there is a constant interchange between the hydroxyl ions and the hydrogen ions, one with the other and with the molecules. The molecules are continually dissociating and reassociating, so the whole thing is in turmoil although the water in the glass will appear on the surface to be quiescent.

Without considering various ramifications of the new chemical testimony, we may say that the importer sought to challenge and undermine the chemical basis underlying the court's logic in the second case. Where the court in the second case found that the naphthenic acid is destroyed by the chemical action of sodium hydroxide in making sodium naphthenate, the importer here shows that the naphthenic acid is not completely united with the sodium hydroxide, and, furthermore, that is is not all "destroyed" since the naphthenic acid is constantly being regenerated in the solution as the sodium naphthenate dissociates into sodium and naphthenate ions, the latter of which recombine with stray hydrogen ions to reform naphthenic acid. Thus the naphthenic acid is not destroyed, but is rather in a constant flux of dissociation, combination, dissociation, and reassociation. To the court's statement that the hydrogen atom (which gives the acid character) is withdrawn and never returned, the importer submitted contradictory testimony tending to show that hydrogen ions from the original naphthenic acid were present at all times in the caustic soda solution, and recombined with the naphthenate radical ion in the final processing with sulfuric acid to reform the *original* naphthenic acid.

The trial court in the instant case, after discussing the testimony and the history of the litigation, made two conclusions of law. It held that the merchandise involved could not be "refined petroleum" because by the testimony and under the authorities petroleum had to be composed of, or to contain, hydrocarbon constituents or substances.

Since naphthenic acid is not a hydrocarbon (a compound solely of carbon and hydrogen), the lower court concluded that it could not be "Petroleum, * * * refined" within the purview of the statute. With that holding of the lower court, we are in complete accord, and do not deem it necessary to further consider the question, nor to consider whether the claim is properly before us in the absence of a cross appeal by appellee.

The holding of the trial court, that the imported product was a distillate obtained from petroleum, did not attempt to distinguish the holding in C. A. D. 138, from its holding in this case. The court below stated merely that the merchandise in the case at bar and in the previous case had not been shown to be the same, and could not be assumed to be the same, simply because both were termed naphthenic acid, "in the face of evidence establishing that there is a variety of such acids."

The Customs Court then proceeded to consider the question *de novo*. It took notice of the fact that the raw distillates are further processed and refined before commercial use. While discussing the opposing theories as to the chemistry involved in the naphthenic acid process, the court was of the opinion that this was not determinative and that the primary question in issue was what Congress intended to encompass in the provision. It concluded that Congress intended the term in its commercial designation; that Congress must have been aware that there is further processing, separating, and refining of the raw distillates to make articles of commerce; that the process involved here, commercially speaking, was simply one of "segregation"; and that therefore Congress intended this merchandise to be included within the provision for "all distillates obtained from petroleum."

The Customs Court seemed to be of the opinion that the second case, C. A. D. 138, was in no way controlling of this case. While it is true that a decision in any case rests upon the particular facts thereof, only a material difference in such facts will render the case inapplicable in a subsequent proceeding. There are certain differences in fact between this case and the second case—the naphthenic acid in this case was obtained through processing the gas oil fraction instead of the kerosene fraction, with a probable production of acid with higher boiling points; and there is also new testimony regarding the nature of the chemical process involved. However, the Customs Court rejected the chemical discussion as irrelevant, and not determinative of the issue.

Thus the question arises, does the difference in the petroleum fraction processed make this a separate and distinct issue? We are unable to so conclude. Every fact essential to the court's decision in the second case is present in this case with the exception of the chemical theories rejected by the trial court. The same process is followed

in the same industry, and a product results which, while possibly commercially a different *grade*, cannot be distinct in a tariff classification. The conclusion is inescapable that affirmance of the judgment of the Customs Court in this case would be, in effect, overruling our decision in the earlier case, C. A. D. 138.

A careful reading of the decision of the lower court in this case leads us to the conclusion that the Customs Court was of the opinion that the decision of this court in the second case was erroneous *under the facts and theories there presented.* Appellee on the other hand chooses to regard the principles of the earlier cases as sound, but relies here on the additional scientific testimony submitted by it to make applicable a new principle of law: namely, "In the progressive petroleum industry, there is nothing surprising in the fact that the present day understanding of the nature of a chemical process may differ from that of 10 years ago. A difference in judicial opinion may appropriately follow."

The foregoing discussion leads us to one important conclusion. We are dealing here with merchandise which normally would have been excluded from paragraph 1733 without question on the authority of the second case. In the case at bar we are asked upon insufficient grounds to make a ruling which will render ineffective and inapplicable our earlier holding, for it cannot be supposed that naphthenic acid from gas-oil should be free, while naphthenic acid obtained by an identical process from kerosene should be dutiable.

In the "napthenic acid" cases hereinbefore described, several hundred pages of testimony have been taken, voluminous briefs have been filed, both by the parties and by *amici curiae*, and five judicial decisions have been handed down. It would seem that every possible fact, argument, and position has been developed, advocated, and taken. We are of the opinion that in the instant case at least this excess of verbiage has tended to obscure the real issues of the case.

We do not believe we would be doing an injustice to either side to assume that Congress in enacting paragraph 1733 did not specifically have in mind naphthenic acid. It is inconceivable that a tariff act could be written that would provide specifically and unequivocally for every possible import. As long as this nation has a system of varying tariffs, the courts will be presented with the problem of classifying goods of which Congress may never have thought, or even known to have existed. The primary rule for the construction of tariff statutes is to determine the congressional intent. The first source for the determination of this intent is the language itself, which is presumed to be used in its normal sense, in the absence of proof of a special meaning in the trade.

In the case now before us, we are obliged to determine the meaning and content of the word "distillate." We are of the opinion that the

designation "distillate" cannot properly be applied to the merchandise at bar. We arrive at this conclusion from an analysis of the word itself and find support for this holding in the history of the involved paragraph.

Several definitions have been given for the word "distillate." The court in the first case did not specifically define distillate, but seemed to equate it with a "product of distillation." In the second case, the court said:

A distillate, then, is something obtained by vaporization and subsequent condensation.

The trial court in the instant case seems to construe a distillate obtained from petroleum as

any product obtained from petroleum by a process or processes which includes distillation.

The parties in the instant case have not recited dictionary definitions of *distillate*. One interesting definition which may partially explain this lack is that taken from *Webster's New International Dictionary*, Second Edition, 1949:

distillate, *n. Chem.* A condensed product of distillation; as the *distillate* from molasses. Specif., any of certain petroleum products (*a term of no precise meaning*). [Emphasis added.]

The word *distillate*, it seems undisputed, is applied to material which has been subjected to the process of distillation. However, it does not seem that the mere fact that a substance is distilled is enough to make it a distillate in all cases and in all respects. All definitions seem to require that a distillate be *obtained by, result from,* or be *produced by* distillation.

There is one essential prerequisite before any substance can properly be termed a distillate—something significant must have happened to the material in the distillation process. The product must be purified, identified, separated, produced, or otherwise changed or modified *by* distillation in order to be a "distillate."

In a constrained sense, perhaps, a pure substance subjected to distillation, might be termed a "distillate" after condensation, even though it was changed not one iota by the process. However, in normal language to speak, for example, of "the distillate of pure water," is absurd and meaningless. Likewise, in the distillation of sea water, for example, certain impurities are included in the resulting product. The product containing these impurities is a distillate; the water after these impurities have been removed is a distillate, or distilled water. But to call such an impurity a "distillate" when taken alone seems to be incorrect, for it is the water which is purified by distillation, and not the impurity.

It is similarly absurd and meaningless in a fractional distillation process to call anything a *distillate* which has not been effectively

separated by that process. We conclude that the primary test of a distillate is that it be obtained by distillation. Authorities which illustrate that distillation is a purifying, separating, or decomposing process are gathered in a footnote.[2]

When we apply this test to the involved import, we are forced to the conclusion that it is obtained by a chemical process, and that it, the import, is not obtained by distillation. It cannot be called a distillate without distorting the normal meaning of the word.

We do not think this holding is at odds with the holding of the second case, but on the contrary it is simply looking at the same problem from a different angle. True, in the second case, the court emphasized the chemical reaction that was proved there to demonstrate that the separation was by chemical means and not by distillation. The court was particularly impressed with the substitution of the hydrogen atom from the sulfuric acid for the original hydrogen.

In the instant case, an equilibrium, or reversible reaction, has been shown to exist in processing the gas oil fraction with caustic soda. This does not in any way lessen the fact that it is this chemical process which is the effective means in obtaining or separating the involved naphthenic acid. Appellee does not show that the sodium hydroxide does not unite chemically with the naphthenic acid; he merely shows that it does not unite completely. If we understand appellee's argument correctly, the following substances are all present in the aqueous solution, at any given instant after it has been removed from the gas oil:

| | |
|---|---|
| $C_nH_{2n-1}COOH$ | (Naphthenic Acid) |
| $H_2O$ | (Water) |
| $C_nH_{2n-1}COONa$ | (Sodium Naphthenate) |
| $H^+$ | (Hydrogen ion) |
| $OH^-$ | (Hydroxyl ion) |
| $C_nH_{2n-1}COO^-$ | (Naphthenate ion) |
| $Na^+$ | (Sodium ion) |
| $NaOH$ | (Sodium hydroxide) |

Little information has been submitted as to the relative quantities of these substances at equilibrium, but there is testimony which indicates that the quantity of $H+$ is minute (though not unimportant) when compared to the amount of water present. Further, the witness McAteer stated that there was an equilibrium between the solution of the naphthenic acid in the gas oil and the solution of the

[2] Columbia Encyclopedia: Distillation, a process used for the purification of a substance, for the separation of substances from one another, and for the breaking down of one substance into fractional parts. * * *

Encyclopedia Britannica: Under Distillation: "It has for its object the separation of liquids from solids, as pure water from sea water, or the separation of two or more liquids, petrol, or gasolene, and paraffin, or kerosene, from crude petroleum." And further, "(a) Fractional Distillation.—Fractional distillation implies the separation of mixtures of substances of different boiling point. * * *

Chambers's Technical Dictionary: distillation, (Chem.) A process of evaporation and re-condensation used for separating liquids into various fractions according to their boiling points or boiling ranges.

Petroleum Dictionary for Office, Field and Factory, by Hollis P. Porter: Distillate—A product of distillation or the fluid condensed from the vapor driven off in the still. Gasoline, naphtha, kerosene, and light lubrication oils are examples of distillates since they are the result of distillation of crude oil; * * * .

naphthenic acid in the aqueous phase. The witness Littman testified that ¼ to 1 per cent of the naphthenic acid dissolves in the water, and that 90 per cent of the naphthenic acid originally present in the gas oil is removed by the process. If we make the logical assumption that the total quantity of naphthenic acid soluble in the solution does not increase, then the amount of sodium naphthenate (ionized or undissociated) present in the solution is 89 to 359 times the amount of naphthenic acid present in the solution.

It was further testified that only 4 per cent of the total sodium naphthenate is dissociated into sodium ions and naphthenate ions. The actual proportions of the constituents of the aqueous solution are of course unimportant, but the probability that the undissociated naphthenic acid in the aqueous phase at any moment forms but a minutely small portion of the naphthenic acid ultimately obtained from the aqueous phase tends to dispel any illusions that the process is not one of chemical breakdown of the naphthenic acid. It also serves to illustrate how very nearly the process proved here is the same as that shown in the second case. Although appellee speaks of a "new chemical theory" being presented, the theory of equilibrium upon which its case is based was known long before the decision in the second case. (See for example, Thorpe's Dictionary of Applied Chemistry, published in 1927, under the heading "Chemical Affinity.") It is at least possible that the chemical equilibrium involved in this process was so near to being a completed reaction, that in the second case it was so described, as a practical matter.

It is deemed unnecessary to discuss at length the reactions involved in the addition of the sulfuric acid to this aqueous phase. Suffice it to say that the sulfuric acid introduces an excess of hydrogen ions into the solution; and that the naphthenate ions unite continuously with the hydrogen ions, until all the sodium naphthenate has been changed into naphthenic acid, which leaves the solution, and is separated by settling. It was testified that the hydrogen ions from the various sources united in proportion to their quantity in the solution; and that since the overwhelming source of hydrogen ions is the sulfuric acid, the hydrogen atom which gives the naphthenic acid its acid character comes principally from the sulfuric acid. Appellant's witness Fisher testified that probably 99.999 per cent of the ionizable hydrogen in the new naphthenic acid was derived from the sulfuric acid. That statement does not seem to have been effectively controverted. Thus, the court's conclusion in the second case that "the hydrogen atom in the naphthenic acid is withdrawn and never returned" while challenged as not precisely true in this case, is true for all practical purposes.

We have concluded that the imported merchandise is not a distillate obtained from petroleum. The differences in fact and chemical

theory proved to exist between this case and the second case, C. A. D. 138, do *not* operate to make the rule of that case inapplicable here. On the contrary, the reason why the rule there established is applicable here is because it does not rest upon chemical theories, but upon the essential limitations of the word "distillate."

In the common meaning of the word, a distillate is so-called because something significant happened to it in the distillation process, i. e., it was separated, or purified, or identified *by* distillation. Kerosene, or gas oil, for example, are practically indefinable without reference to distillation or its effects; they owe their identity to the process of distillation.

In contrast, the distillation process was of so little significance in the production of the naphthenic acid here involved, that to call it a distillate is to call a grain of sand big when compared with a mountain. The fact that the naphthenic acid in the gas oil was incidentally separated from the rest of the naphthenic acid, is insignificant in the classification of the product as imported. The import was produced and obtained by a chemical process—be that a process of completed reaction or equilibrium—and not to any effective extent by distillation. There is a vast difference between the meaning of the word "distillate" as applied to the distillates specifically enumerated in the Tariff Act and the meaning it would have if applied to the imported merchandise.

The basic error of the trial court in this case resides in the assumption that any product produced by a process which *includes* distillation is necessarily a distillate. Another fallacy in the trial court's decision has been pointed out by *amici curiae*. If the naphthenic acid as present in the crude oil is not petroleum because it is not a hydrocarbon, then no part of it could be a distillate obtained from petroleum, because it would not be obtained from petroleum, but from a compound other than petroleum.

Other arguments advanced by appellee are either irrelevant or have been implicitly answered in the foregoing discussion.

In closing, it is deemed appropriate to take brief notice of the legislative history of the petroleum paragraph in the tariff acts. Prior to the Tariff Act of 1922 the parallel provision to paragraph 1733 provided for "all products obtained from petroleum." In the 1922 Act the word "products" was changed to "distillates" as it is in the present Act. The change was suggested by the Tariff Commission, and the reason for the suggested change is given in the "Report to Congress Suggesting A Reclassification of Schedule A And Of Related Provisions Of The Tariff Act of October 3, 1913," published by the Government Printing Office, 1921, at page 118:

(5) It is suggested that the word "products" be changed to "distillates," because it is believed that the intent of this paragraph was to include only such

products as gasoline, benzine, and naphtha, which are *obtained* from petroleum *by* distillation processes. Petroleum is also the crude material from which a number of refined chemical compounds, e. g., ethyl chloride, isopropyl alcohol, etc., can be prepared *by complex methods of chemical synthesis*. These materials are more highly manufactured products, which presumably are dutiable under general provisions in Schedule A, although there is at least the possibility that they might be regarded as "products obtained from petroleum." [Emphasis added.]

From the foregoing reference it is seen that the word "distillates" was carefully chosen by Congress to limit the items given free entry under the petroleum paragraph. Moreover, if the reasoning of the lower court in this case were carried to its logical conclusion, it is difficult to see how any "product" obtained from petroleum, which is incidentally distilled, could be excluded from free entry.[3]

For the reasons hereinbefore stated, it follows that the judgment of the United States Customs Court must be *reversed*.

On account of illness, GARRETT, Chief Judge, did not participate in the hearing or decision of this case.

COLE, J., having participated below, disqualified himself from sitting in this case.

WORLEY, J., concurs in the conclusion.

---

[3] *Cf.* the following statement appearing in the *Encyclopedia Britannica*, under Propyl Alcohols (Vol. 18, page 591):

*Iso-propyl alcohol*, $(CH_3)_2CH.OH$, is now manufactured on an extensive scale from propylene, $CH_3:CH:CH_2$, obtained by the cracking of petroleum (*See* OLEFINES.) This olefine is absorbed in sulphuric acid, the liquid diluted with water *and distilled* [emphasis added], when *iso*-propyl alcohol is obtained. * * * Under the definition applied by the trial court would iso-propyl alcohol (specifically considered not a distillate by Congress) be classified as a "distillate obtained from petroleum"?

