F.LLI DE CECCO DI FILIPPO FARA SAN MARTINO S.P.A., LA MOLISANA
INDUSTRIE ALIMENTARI S.P.A., RUMMO S.P.A. MOLINO E PASTIFICIO, AND
PASTIFICIO FRATELLI PAGANI S.P.A., PLAINTIFFS, AND BARILLA
ALIMENTARI S.P.A., ASSOCIATION OF FOOD INDUSTRIES PASTA GROUP, AND
INDUSTRIA ALIMENTARI COLAVITA S.P.A. PLAINTIFF-INTERVENORS *v.*
UNITED STATES, DEFENDANT, AND BORDEN, INC., HERSHEY FOODS CORP.,
AND GOOCH FOODS, INC. DEFENDANT-INTERVENORS

Consolidated Court No. 96–08–01930

(Dated October 2, 1997)

*Gilbert, Segall and Young LLP, (Jeffrey E. Livingston, David D. Howe*, and *Anthony J. Harwood)* for F.lli De Cecco di Filippo Fara San Martino S.p.A. and Pastificio Fratelli Pagani S.p.A., plaintiffs.

*Rogers & Wells, (William Silverman, Douglas J. Heffner, Stephen J. Claeys,* and *Richard P. Ferrin)* for La Molisana Industrie Alimentari S.p.A. and Rummo S.p.A. Molino e Pastificio, plaintiffs.

*Colavita USA, (Anthony J. Profaci)* for Industria Alimentari Colavita S.p.A., plaintiff-intervenor.

*Harris Ellsworth & Levin, (Herbert E. Harris II, Cheryl Ellsworth, Jeffrey S. Levin* and *Jennifer de Laurentiis)* for Association of Food Industries Pasta Group, plaintiff-intervenor.

*O'Melveny & Meyers (Peggy A. Clarke, Gary N. Horlick* and *Lisa H. Marino)* for Barilla Alimentari S.p.A., plaintiff-intervenor.

*Frank W. Hunger,* Assistant Attorney General, *David M. Cohen,* Director, Commercial Litigation Branch, Civil Division, United States Department of Justice *(Delfa Castillo* and *Jeffrey Telep), Dean Pinkert,* Attorney-Advisor, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for defendant.

*Collier, Shannon, Rill & Scott, PLLC, (Paul C. Rosenthal, David C. Smith, Lynn E. Duffy, Eric R. McClafferty* and *Craig L. Silliman)* for Borden, Inc., Hershey Foods Corp. and Gooch Foods, Inc., defendant-intervenors.

## OPINION

RESTANI, *Judge:* This matter is before the court on plaintiffs' motion for judgment on the agency record pursuant to USCIT R. 56.2. Plaintiffs, F.lli De Cecco di Filippo Fara San Martino S.p.A. ("De Cecco"), Rummo S.p.A. Molino e Pastificio ("Rummo"), La Molisana Industrie Alimentari S.p.A. ("La Molisana"), and Pastificio Fratelli Pagani S.p.A. ("Pagani"), and plaintiff-intervenors, Barilla Alimentari S.p.A. ("Barilla"), Association of Food Industries Pasta Group ("AFI"), and Industria Alimentari Colavita S.p.A. ("Colavita"), challenge the final determination by the International Trade Administration, United States Department of Commerce ("Commerce"), in *Certain Pasta from Italy,* 61 Fed. Reg. 30,326 (Dep't Commerce 1996) (final det. of LTFV sales) (hereinafter *"Final Determination"), amended by Certain Pasta from Italy,* 61 Fed. Reg. 38,547 (Dep't Commerce 1996) (antidumping duty order and amended final det.) (hereinafter *"Order").*

Plaintiffs allege that Commerce's failure to terminate the provisional measures period following the four month period after the publication

of its preliminary determination of sales at less than fair value was not in accordance with law nor supported by substantial evidence in the record.

## BACKGROUND

On May 12, 1995, Borden, Inc., Hershey Foods Corp., and Gooch Foods, Inc. ("petitioners") filed a petition with Commerce alleging that certain pasta[1] from Italy and Turkey was being sold, or was likely to be sold at less than fair value. *Certain Pasta from Italy and Turkey*, 60 Fed. Reg. 30,268, 30,268 (Dep't Commerce 1995) (init. of antidumping duty investigations). Commerce initiated an antidumping investigation on June 8, 1995. Before Commerce made a preliminary determination and pursuant to a solicitation by Commerce, respondents, in writing, stated that in the event Commerce reached an affirmative preliminary determination, they would request that Commerce postpone reaching a final determination until not later than 135 days after publishing the preliminary determination, pursuant to 19 U.S.C. § 1673d(a)(2)(A) (1994). Letter from Counsel for De Cecco to Susan Esserman (Dec. 11, 1995) at 2; De Cecco App., Tab 6, at 2.

Commerce made an affirmative preliminary determination of LTFV sales on December 14, 1995, but it was not published until January 19, 1996. *Certain Pasta from Italy*, 61 Fed. Reg. 1,344, 1,344 (Dep't Commerce 1996) (prelim. det. of LTFV sales and postponement of final det.) (hereinafter "*Prelim. Determination*"). The preliminary determination stated that Commerce had granted respondents' request that the final determination be postponed until not later than 135 days after publication of the affirmative preliminary determination. *Id.* at 1,346. Commerce also noted that under its authority pursuant to Section 733(d) of the Tariff Act (codified at 19 U.S.C. § 1673b(d) (1994)(effective date Jan. 1, 1995)), it was implementing provisional measures, namely that Commerce instruct the United States Customs Service ("Customs") to suspend liquidation of subsequent entries of merchandise subject to the investigation and require from respondents a cash deposit or the posting of a bond at stated rates. *Id.* at 1,351.

On January 29, 1996, AFI sent a letter to Commerce inquiring about the length of time the provisional measures would be in place. Letter from Counsel for AFI to Ronald H. Brown (Jan. 29, 1996) at 2; Citing the text of 19 U.S.C. § 1673b(d), AFI contended that the provisional measures period could be in place no longer than four months "except that the administering authority may, at the request of exporters representing a significant proportion of exports of the subject merchandise, ex-

---

[1] The merchandise investigated consists of certain non-egg dry pasta in packages of five pounds (or 2.27 kilograms) or less, whether or not enriched or fortified or containing milk or other optional ingredients such as chopped vegetables, vegetable purees, milk, gluten, diastases, vitamins, coloring and flavorings, and up to two percent egg white. *Final Determination*, 61 Fed. Reg. at 30,329–30. The subject pasta is typically sold in the retail market, in fiberboard or cardboard cartons or polyethylene or polypropylene bags, of varying dimensions. *Id.* at 30,239–30.

Excluded from Commerce's scope of investigation was refrigerated, frozen, or canned pasta, as well as all forms of egg pasta, with the exception of non-egg dry pasta containing up to two percent egg white. *Id.* at 30,230. Also excluded were imports of organic pasta from Italy that were accompanied by the appropriate certificate issued by the Associazione Marchigiana Agricultura Biologica or by Bioagricoop scrl. *Id.*

tend that 4-month period to not more than 6 months." *Id.* at 1; De Cecco App., Tab 9, at 1 (quoting 19 U.S.C. § 1673b(d)). AFI requested Commerce to instruct Customs to suspend the imposition of provisional measures no later than May 19, 1996 (four months after the preliminary determination was published), unless exporters representing a significant proportion of the merchandise make a specific request to the extend the period.[2] *Id.* at 4; De Cecco App., Tab 9, at 4. On February 7, 1996, in a memorandum placed in the administrative record from the Office of the Chief Counsel for Import Administration to the Assistant Secretary for Import Administration ("Opinion Memorandum"), Commerce concluded that respondents' written request for postponement of the final determination contained a request, implied by law, to extend the provisional measures period from four months to six months. *Opinion Memorandum*, at 4; De Cecco App., Tab 12, at 4. AFI wrote two follow-up letters protesting Commerce's decision.[3] Letter from Counsel for AFI to Susan G. Esserman (Feb. 12, 1996) at 1; AFI App., at 1; Letter from Counsel for AFI to Barbara R. Stafford (Mar. 4, 1996) at 1; AFI App., at 1. Commerce, however, affirmed its decision to extend the provisional measures period to six months in the final determination, published June 14, 1996. *Final Determination*, 61 Fed. Reg. at 30,365.

Plaintiffs filed this action on August 19, 1996.

## STANDARD OF REVIEW

In an action for judgment upon the agency record for a final determination in an antidumping investigation, the court shall hold unlawful any determination, finding, or conclusion found to be unsupported by substantial evidence on the record, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i) (1994).

## DISCUSSION

Plaintiffs challenge Commerce's extension of the provisional measures period beyond the four month period after the affirmative preliminary determination as not in accordance with law. Plaintiffs claim that Commerce may only extend the provisional measures period if the exporters explicitly request an extension of that period. Although the parties agree that no exporter explicitly asked for an extension of the

---

[2] Plaintiffs also include with their brief two affidavits which describe telephone conversations early in the four month period between Gary Taverman and John Brinkman, Commerce officials responsible for conducting the antidumping investigation, and Douglas Heffner and William Silverman, attorneys at Rogers & Wells, representing La Molisana and Rummo. The affidavits describe telephone calls in which the Commerce officials asked the attorneys if the Italian pasta companies represented by Rogers & Wells would request an extension of the provisional measures from four months to six months. Plaintiffs submit the affidavits to demonstrate that they informed Commerce that at least some of the pasta companies explicitly expressed their desire that provisional measures not be extended, while there were no companies which asked that the provisional measures be extended.

Commerce did not keep a record of these conversations and has moved that the affidavits be stricken because they are not part of the record. Plaintiffs argue that, pursuant to Section 777(a)(3) of the Act (codified at 19 U.S.C. § 1677f(a)(3) (1994)), Commerce is required to include in the administrative record of a proceeding a record of any *ex parte* meetings with interested parties if information relating to the proceeding was discussed or presented during the meeting. The information recorded in the affidavits is information that was before Commerce with respect to whether a request for extension of provisional measures should be implied under the facts of this case. As the court has decided this case on purely legal grounds, it does not rely on the affidavits. The affidavits are, however, a part of the record as reflected in the separate opinion issued herewith.

[3] Neither AFI nor any other exporter withdrew its request for delay of the final determination. At the oral argument, it was suggested that hurrying Commerce at this point could have adverse consequences for respondents.

provisional measures period, Commerce claims that the statute is ambiguous because it is silent as to the form, manner, and timing of how an exporter may request an extension. Thus, Commerce argues that as it has the authority to administer and interpret the statute, its interpretation that a request for a postponement of the final determination implies a request to also extend the provisional measures period, must be afforded deference by the court.

The court, in reviewing Commerce's construction of the statute, must first look to whether Congress has directly spoken on the issue. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. If the statute is silent or unclear regarding the specific issue, however, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.

"The primary source for determining legislative intent is the statutory language itself, 'which is presumed to be used in its normal sense, in the absence of proof of a special meaning in the trade.'" *Holford USA Ltd. v. United States*, 912 F. Supp. 555, 561 (Ct. Int'l Trade 1995) (quoting *United States v. Esso Standard Oil Co.*, 42 C.C.P.A. 144, 151 (1955)); *see also Smith v. United States*, 508 U.S. 223, 228 (1993) ("When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning."); *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there.").

Section 1673b(d) of Title 19 of the U.S. Code provides:

(d) Effect of determination by the administering authority

If the preliminary determination of the administering authority under subsection (b) of this section is affirmative, the administering authority—

\* \* \* \* \* \* \*

(2) shall order the suspension of liquidation of all entries of merchandise subject to the determination which are entered, or withdrawn from warehouse, for consumption on or after the later of—

(A) the date on which notice of the determination is published in the Federal Register, or

(B) the date that is 60 days after the date on which notice of the determination to initiate the investigation is published in the Federal Register, and \* \* \*

The instructions of the administering authority under paragraphs (1) and (2) [suspension of liquidation and posting of cash deposits or bonds] *may not remain in effect for more than 4 months, except that the administering authority may, at the request of exporters repre-*

> *senting a significant proportion of exports of the subject merchandise, extend that 4-month period to not more than 6 months.*

19 U.S.C. § 1673b(d)(2)(emphasis added).

Although the word "request" is not defined in the statute, such an absence of explicit definition for the term does not render the statute "silent" for purposes of a *Chevron* analysis. When confronted with an issue of statutory construction focused on the multiple possible definitions of a particular phrase, *Chevron* mandates an inquiry into the Congressional intent, evidenced by the language of the statute itself, before determining that the statute is "silent."

> The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.

*Chevron*, 467 U.S. at 843 n.9. Congress may have "addressed the precise question at issue," *Chevron*, 837 U.S. at 843, that is, the actions covered by the term "request," through its selection of the word itself. In order to effectuate Congressional intent as expressed through the enacted language, the court is required, in line with *Holford* and *Smith*, as well as general principles of statutory construction, to inquire into the ordinary, natural meaning ascribed to "request." *See Smith*, 508 U.S. at 228; *Holford USA*, 912 F. Supp. at 561. *See also Smith*, 508 U.S. 242–43 (Scalia, J., dissenting).

The dictionary definition of the word "request" is "the act [or] an instance of asking for something." *Webster's Third New International Dictionary* 1929 (1993). The natural and ordinary meaning is clear—in order to request something, a person must expressly ask for it. Accordingly, the statute is not silent or ambiguous as to the meaning of the term. Regardless of the timing or whether the request must be written or oral, the exporters must ask for the extension of provisional measures.

Commerce claims that there are many reasons why the court should not rely on the straightforward language of 19 U.S.C. § 1673b(d). Commerce argues that the court cannot read 19 U.S.C. § 1673b(d) in isolation, but must construe its meaning taking into consideration 19 U.S.C. § 1673d(a)(2)(A). In support, Commerce argues that the legislative history and its own past practices reveal a clear legislative intent to correlate the timing of provisional measures with the time between the preliminary determination and the final determination.

Section 1673d(a)(2)(A) discusses the extension of the final determination.[4] Without citing any legislative history, Commerce claims that Congress' purpose was to have provisional measures last in every case from the day the preliminary determination is published until the final determination is published. Commerce argues that if the court accepts plaintiffs' interpretation, exporters will be able to postpone the final determination and create a time gap between the end of the four-month provisional measures period and the final determination. During this period, exporters will be able to ship products to the United States upon which Commerce cannot impose an antidumping duty, nor can it force the exporters to deposit a bond or other security. This result, Commerce and petitioners claim, is nonsensical and absurd, because Congress could never have intended for there to be such a gap during an investigation. *See Algoma Steel Corp. v. United States*, 12 CIT 518, 520, 688 F. Supp. 639, 642 (1988), *aff'd*, 865 F.2d 240 (Fed. Cir. 1989) (statutory language should be interpreted so as to avoid an absurd result that Congress could not have intended). Commerce claims that the only way to read the statute is to allow Commerce to infer from a request for a postponement of a final determination an implied request to extend the provisional measures. This argument ignores a number of issues including the important fact that Commerce controls the timing of the investigation and can, if it chooses, decline to delay its final determination if no request for extension of provisional measures is made. 19 U.S.C. § 1673d(a)(2) ("The administering authority may postpone making the final determination").

Commerce also claims that the two provisions (19 U.S.C. § 1673d(a)(2)(A) and 19 U.S.C. § 1673b(d)) should be read, in essence, to overlap each other because they are both worded similarly, that is, both provisions require a request of exporters constituting "a significant proportion of exporters." This is not a particularly strong argument for rendering one of the provisions redundant.

Plaintiffs argue that if the court follows Commerce's interpretation, it will violate an important canon of statutory interpretation, that is, if possible, a statute must "be construed in such a fashion that every word has some operative effect." *United States v. Nordic Village, Inc.*, 503 U.S. 30, 36 (1992). Here, Commerce's decision to imply a request for extension of provisional measures leaves no operative effect or practical consequences to 19 U.S.C. § 1573b(d)'s independent requirement of a "request."

Furthermore, it would have been very easy for Congress to link the two statutes with an internal reference. For example, 19 U.S.C.

---

[4] Section 1673d, Title 19 of the United States Code provides:
(a)(2) Extension of period for determination
The administering authority may postpone making the final determination under paragraph (1) until not later than the 135th day after the date on which it published notice of its preliminary determination under section 1673b(b) of this title if a request in writing for such a postponement is made by—
(A) exporters who account for a significant proportion of exports of the merchandise which is the subject of the investigation. ' * *
19 U.S.C. § 1673d(a)(2)(A).

§ 1673e(c)(1994) allows Commerce to waive the requirement that estimated duties must be posted in cash after a final determination, but Congress specified that this requirement may not be waived if exporters requested a postponement of the final determination under 19 U.S.C. § 1673d(a)(2)(A). Here, neither § 1673b(d) nor § 1673d(a)(2)(A) references the other.

Reading the statute as a whole renders no conclusion other than the finding that two different requests are involved. A determination that the language of the statute is plain and unambiguous allows the court to close its inquiry except in a small number of situations:

> [W]hen statutory interpretation is at issue, the plain and unambiguous meaning of a statute prevails in the absence of clearly expressed legislative intent to the contrary. Further, only the "most extraordinary showing of contrary intentions" would lead us to disregard the plain meaning of the statute.

*Vesser v. Office of Personnel Management*, 29 F.3d 600, 605 n.3 (Fed. Cir. 1994) (citations omitted). Thus, we must determine if there is a clear showing that Congress intended to foreclose a time gap between the end of provisional measures and the publishing of a final determination despite the language and structure of the statute.

Commerce and petitioners attempt to avoid the requirements of the statute by citing to Commerce's past practice and URAA legislative history. First, before the URAA, under the statute Commerce had relatively free reign over the use of provisional measures. The provisions located at 19 U.S.C. § 1673d(a)(2)(A)(1988) and 19 U.S.C. § 1673b(d)(1988) allowed it to implement these measures, but did not limit the time period in which they could be applied. Commerce and petitioners, citing to numerous antidumping investigations, claim that Commerce's practice was to maintain provisional measures until it made a final determination. Thus, Commerce argues that before the URAA, if an exporter under investigation requested a postponement of the final determination, Commerce automatically kept the provisional measures intact. Previous to the URAA the statute did not require that exporters request an extension of provisional measures. 19 U.S.C. § 1673b(d) (1988); 19 U.S.C. § 1673d(a)(2)(A) (1988). Under the statute Commerce did not need to find a request from an exporter to extend provisional measures, and in none of the investigations to which Commerce and petitioners cite, did Commerce state that it found such an implied request. Under the statute Commerce was free to extend the provisional measures on its own.[5]

Commerce argues here that it was necessary in the past to infer a request in order to be consistent with GATT requirements, if not the stat-

---

[5] *See Furfuryl Alcohol from the People's Republic of China*, 59 Fed. Reg. 65,009, 65,011 (Dep't Commerce 1994) (prelim. det. of LTFV sales)(mentioning only boilerplate language of "this suspension of liquidation will remain in effect until further notice"); *Carbon Steel Wire Rod from Trinidad and Tobago*, 48 Fed. Reg. 20,109, 20,111 (Dep't Commerce 1983) (prelim. det. of LTFV sales) (same); *Chrome-Plated Lug Nuts from the People's Republic of China*, 56 Fed. Reg. 15,857, 15,859 (Dep't Commerce 1991) (prelim. det. of LTFV sales) (same); *Petroleum Wax Candles from the People's Republic of China*, 51 Fed. Reg. 6,016, 6,017 (Dep't Commerce 1986) (prelim. det. of LTFV sales) (same).

ute.[6] Commerce does not allege that it ever published this rationale, and although Commerce may endeavor to avoid conflicts with international agreements, its obligation is to follow the statute. *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 966 F.2d 660, 667–78 (Fed. Cir. 1992). Furthermore, what Commerce might infer, given the prior statute, is not necessarily acceptable under a statute with an explicit requirement.

Moreover, a gap in provisional measures is not anathema to the statutory scheme. Provisional measures are applied in both antidumping and countervailing duty ("CVD") investigations. Plaintiffs correctly point out that in CVD investigations, there may be a gap period if the final determination is extended, *see United States Steel Corp. v. United States*, 9 CIT 453, 455–56, 618 F. Supp. 496, 499 (1985), and thus, it is not absurd to permit a gap period in antidumping investigations. Commerce and petitioners respond first by referring to the prohibition in the Uruguay Round Subsidies Agreement against provisional measures extending beyond four months, *Agreement on Subsidies and Countervailing Measures*, Art. 17.4, *reprinted in The Results of the Uruguay Round of Multilateral Trade Negotiations: The Legal Texts* 264, 290 (1995) (hereinafter *"Subsidies Agreement"*), pointing out that the counterpart provision in the Antidumping Agreement *does* allow for the possible existence of such measures for up to six months, *Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade 1994*, Art. 7.4, *reprinted in The Results of the Uruguay Round of Multilateral Trade Negotiations: The Legal Texts* 168, 182 (1995) (hereinafter *"Antidumping Agreement"*). Commerce also notes that the systems are different in their approach to the extension of provisional measures because a CVD final determination can be postponed only by a request of petitioners, 19 U.S.C. § 1671b, whereas, in an antidumping investigation, petitioners as well as respondents can request a postponement of the final determination, 19 U.S.C. §§ 1673b(d), 1673d(a)(2)(B). Commerce argues that as petitioners are the sole party who have the right to request a postponement of the final determination in a CVD investigation, the gap exists under the CVD law so that exporters do not bear the costs (i.e., continuing provisional measures) of a petitioner's request for a delay. Under the antidumping provisions, however, the ability of either party to request a postponement presumably requires that the requesting party bear the costs of the delay, either in terms of continuing provisional measures (for exporters) or the continuing inflow of subsidized goods (for petitioners). While Commerce has presented what may be one

---

[6] GATT Antidumping Code, Article 7.4 states:

*The application of provisional measures shall be limited to as short a period as possible*, not exceeding four months or, on decision of the authorities concerned, upon request by exporters representing a significant percentage of the trade involved, to a period not exceeding six months.

Agreement on Implementation of Article VI of the General Agreement of Tariffs and Trade 1994, *reprinted in Legal Texts—The Results of the Uruguay Round of Multilateral Trade Negotiations* 203 (1995)(emphasis added). The same language was used in the earlier Tokyo Round Agreement on the Interpretation of Article VI. *See* GATT Antidumping Code, Article 10.

explanation for the gap to exist in CVD cases, such an explanation does not convince the court that, as a matter of law, an exporter's request for a delay in the final determination of an antidumping investigation necessarily precludes the existence of a gap period.

The strong wording in both 19 U.S.C. § 1671b(d) (CVD provisional measures) and 19 U.S.C. § 1673b(d) and the corresponding sections of the Antidumping Agreement[7] suggests that the GATT signatories meant to put a strict limit on the imposition of provisional measures, particularly because of the harshness of the penalties involved, and that Congress has now dealt specifically with the GATT requirement. While the statute recognizes a need to balance petitioners' and respondents' harms, there is also a recognition of a need for procedural fairness in the limitation of the period for provisional measures. Petitioners correctly point out that the time limit on provisional measures initially arose partly because there was international concern with the length of time U.S. antidumping investigations were taking, stemming from the two-agency format which the U.S. employs. *See* Terence P. Stewart et al., *Antidumping, in* 2 *The GATT Uruguay Round: A Negotiating History (1986–1992)* 1383, 1423–24 (Terence P. Stewart ed., 1993) (international concern originating during 1964 Kennedy Round). As Congress' intent, evidenced by the URAA, was to insure U.S. law was consistent with the GATT, *see The Uruguay Round Agreements Act: Statement of Administrative Action*, H.R. Doc. No. 103–316, at 656–57 (1994) [hereinafter "SAA"], it can be inferred that Congress' intent was to keep provisional measures to as short a period as possible, only to be extended by a request from those whom the provisional measures adversely affect. Thus, in some cases where the final determination must be delayed, there may be a gap if the statutory provisions for extending provisional measures are not met.

Commerce next claims that the SAA supports its interpretation that the statute must be read to allow for an implied request. "The [SAA] was approved by Congress as an 'authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements * * * in any judicial proceeding in which a question arises concerning such interpretation or application.'" *Fieldston Clothes, Inc. v. United States*, 903 F. Supp. 72, 78 n.9 (Ct. Int'l Trade 1995) (quoting 19 U.S.C.A. § 3512(d) (West Supp. 1995)). Commerce points out that the SAA discusses the changes made to 19 U.S.C. § 1673b(d) and claims that the sentence, "[t]he amendments do not require any change in existing practice," *SAA*, H.R. Doc. No. 103–316, at 874, clearly shows that when Congress implemented the URAA, it meant for the new provisions merely to codify previous practice.

---

[7] Article 7.4 of the Antidumping Agreement states:

> *The application of provisional measures shall be limited to as short a period as possible*, not exceeding four months or, on decision of the authorities concerned, upon request by exporters representing a significant percentage of the trade involved, to a period not exceeding six months.

*Antidumping Agreement,* at 182 (emphasis added).

Plaintiffs argue, and the court agrees, that Commerce did not read the SAA fully. The sentence cited by Commerce discusses the fact that 19 U.S.C. § 1673b(d)(2)(B) was changed to prohibit the imposition of provisional measures less than sixty days after the initiation of an investigation. The next paragraph discusses 19 U.S.C. § 1673b(d)(2):

> Amended sections 703(d)(1) [19 U.S.C. § 1671b(d)(1)] and 733(d)(2) [19 U.S.C. § 1673b(d)(2)] implement the Agreements' provisions limiting the duration of provisional measures to four months. In antidumping investigations, Commerce may extend the period to six months if exporters representing a significant portion of exports of the subject merchandise so request. The amendments do not affect the ability of the United States to impose duties retroactively where critical circumstances exist.

*Id.* The legislative history does not say that Commerce's prior practice of automatically continuing provisional measures until the publication of the final determination was still acceptable. The section that did not require any change in existing practice was the prohibition of implementation of provisional measures less than sixty days after the initiation of an investigation. This was addressed in 19 U.S.C. § 1673b(d)(2)(B), which provides that provisional measures can only begin after an affirmative preliminary determination has been published.

Commerce claims that if the plain meaning of the statute was effectuated, an absurd result would occur as no exporter would ever request an extension of the provisional measures. Plaintiffs counter that there are certain strategic advantages in a small number of situations which might lead exporters to request an extension. Even though an extension of provisional measures usually may not be desirable to exporters, that does not mean that the statutory construction is nonsensical. Plaintiffs state that it is perfectly within Commerce's power to find that if an exporter requests a postponement of the final determination without requesting an extension of the provisional measures, it is a compelling reason for not granting a postponement. In fact, Commerce demonstrated that it realized that its "implied request" theory was not an acceptable way to implement the statute when, on May 19, 1997, Commerce proposed changes to the C.F.R., adding 19 C.F.R. § 351.210(e)(2):

> Requests by exporters. In the case of a request submitted under paragraph (e)(1) of this section by exporters who account for a significant proportion of exports of subject merchandise (*see* section 735(a)(2)(A) of the Act), the Secretary will not grant the request unless those exporters also submit a request described in the last sentence of section 733(d) of the Act (extension of provisional measures from a 4-month period to not more than 6 months).

*Antidumping Duties; Countervailing Duties; Final Rule*, 62 Fed. Reg. 27,296, 27,391 (Dep't Commerce 1997)(proposed 19 C.F.R. § 351.210(e)(2)). Commerce, in its comment on this proposal, stated:

> [I]nstead of assuming that a request for postponement includes an implied request for an extension of provisional measures, we prefer to rely on the Department's discretionary authority to deny requests for postponements of final determinations. More specifically, the absence of a request to extend provisional measures would constitute a compelling reason * * * for denying a request to postpone a final determination.

*Id.* at 27,313. Commerce, perhaps realizing that the statutory language was plain and unambiguous, invoked its own discretionary authority to link the two provisions through the approval process. Commerce's interpretation of the statute as argued here may be reasonable in light of its own policy objectives, but it is contrary to Congress' intent as expressed in the plain language of 19 U.S.C. § 1673b(d). Furthermore, as indicated, before the regulation was prepared there was no public notice that a request for delay of the final determination under the new statute would be considered a request for extension of provisional measures. Where a statute requires a "request," one should not be implied by an action under a separate statutory provision. Moreover, it should be noted that there is no evidence that plaintiffs tried to trick Commerce. It was Commerce that initially asked plaintiffs to request a delay in the final determination. It also could have solicited a request for extension of remedies, but did not do so at that time.[8]

For the above reasons, plaintiffs' motion for judgment on the agency record is granted. Plaintiffs must submit a prepared form of judgment within 11 days. Comments on plaintiffs' submission are due within 5 days thereof.

---

[8] Plaintiffs also submit an alternative argument. They claim that even if the court decides that Commerce may find an implied request for extension of the provisional measures, exporters have a legal right to keep the length of the provisional measures period to four months. They further argue that an implied request to waive that right must be clear, decisive and unequivocal. They claim as a matter of fact that their actions did not constitute such a waiver. The court does not reach this issue as indicated in note 2.