Slip Op. 02-14

UNITED STATES COURT OF INTERNATIONAL TRADE

_____
                                        :
RUBIE'S COSTUME COMPANY,                 :
                                        :
                    Plaintiff,           :
                                        :   Before: WALLACH, Judge
            v.                           :   Court No.: 99-06-00388
                                        :
UNITED STATES,                           :
                                        :
                    Defendant.           :
_____:

[Plaintiff's motion for summary judgment GRANTED; Defendant's motion DENIED]


                                            Decided: February 19, 2002

Adduci, Mastriani & Schaumberg, L.L.P. (V. James Adduci II), for Plaintiff.

David W. Ogden, Assistant Attorney General; Joseph I. Liebman, Attorney in Charge,
International Trade Field Office; John J. Mahon, Civil Division, Department of Justice,
Commercial Litigation Branch; Beth C. Brotman, Office of the Assistant Chief Counsel,
International Trade Litigation, United States Customs Service, of counsel, for Defendant.

Morgan, Lewis & Bockius LLP (Mark N. Bravin), for Paper Magic Group, Inc. as Amicus
Curiae.

## OPINION

**WALLACH, Judge.**


## I
## Preliminary Statement

Plaintiff, Rubie's Costume Company ("Rubie's"), sued to challenge the United States

Customs Service's ("Customs") denial of its domestic interested party petition concerning the

classification of certain imported textile costumes as "festive articles" within Chapter 95 of the

Harmonized Tariff Schedule of the United States ("HTSUS"). Plaintiff now moves for summary

1

judgment, claiming that these costumes should have been classified as "wearing apparel" within subheading 6114.30.30 of the HTSUS. The Government contends that Customs properly classified the merchandise as "festive articles" and on this basis, cross-moves for summary judgment in its favor.

At the heart of this case is the exclusion from Chapter 95 which covers "Toys, Games and Sports Equipment: Parts and Accessories Thereof" by Note 1(e) of "fancy dress, of textiles, of chapters 61 or 62." It is the Government's contention that "fancy dress" as used in the Note means formal wear such as tuxedos or elaborate stage costumes. Thus, it argues the exclusion does not write out inclusion in Chapter 95 of inexpensive and "flimsy" Halloween costumes. If the phrase includes both types of clothing; the formal and expensive, and the cheap and flimsy, then the Government cannot prevail since the exclusion covers the imported articles.[1] Because common usage in the United states includes both types of clothing within the phrase "fancy dress," because Note 1(e) of Chapter 95 clearly excludes textile costumes from the definition of "festive articles," because the Government's analysis requires that the Explanatory Note be read to include a reference to tuxedos and ball gowns in a chapter devoted to toys, games and sports equipment, and under the doctrine of ejusdem generis, the court denies the Government's motion and grants the Plaintiff summary judgment.

## II
## Background

The subject merchandise consists of imported textile costumes made in toddler, child and adult sizes, traditionally worn in conjunction with the celebration of Halloween or to costume

---

[1]And assuming that the items at issue are articles of wearing apparel, the subject of Chapters 61 and 62.

parties. Plaintiff Rubie's Costume Co., Inc.'s Memorandum of Law in Support of its Motion for Summary Judgment ("Plaintiff's Memo") at 2.[2] It includes an exemplary "Scream Robe" costume submitted by Customs, as well as photographic and verbal descriptions of other costumes including "Witch of the Webs," "Abdul, Sheik of Arabia," "Pirate Boy," "Cute & Cuddly Clown," and "Witch."[3]

Under the Tariff Schedule of the United States ("TSUS"), adult Halloween costumes were originally classified as wearing apparel while children's costumes were classified as toys. This classification of adult costumes was subsequently challenged by domestic importers in Traveler Trading Co. v. United States, 13 CIT 380, 713 F. Supp. 409 (1989), which resulted in Customs' reclassification of the merchandise as toys due to their flimsy construction and lack of utilitarian value. Id. at 381, 411. The court's rationale in Traveler Trading equated flimsiness with a lack of utilitarian value as wearing apparel, thereby concluding that flimsy Halloween costumes are classifiable as toys in Chapter 95 as they "have no practical application as wearing apparel and serve only to amuse." Id. at 383, 412. After the adoption of the Harmonized Tariff Schedule of the United States ("HTSUS") in 1988, which replaced the TSUS, Customs reversed its position and once again determined that all textile costumes should be classified as items of apparel. See Plaintiff's Memo at 3 (see also Headquarters Ruling ("HQ") 087291, December 4,

[2]See also, Request For Information of July 26, 1996, Ex. 2 to Defendant's Cross-Motion XXX, The parties are in accord that the subject merchandise is a costume made of knitted 100 percent polyester, Plaintiff's Statement of Undisputed Facts, but differ as to whether it is "flimsy, non-durable and generally recognized as not a normal article of wearing apparel." Defendant's Statement of Additional Undisputed Material Facts and Plaintiff's Response.

[3] The "Witch of the Webs," is a child's size knit polyester black dress that falls in raw edged points just below the knee. The "Abdul Sheik of Arabia" costume is an adult size ankle length sheath of knit polyester with some unfinished edges. The "Pirate Boy" is a child size costume made up of separate top and pants of knit polyester with raw edged points at sleeves and waist. The "Witch" costume is a child's size long sleeved black dress of knit polyester with raw edged points. The "Cute and Cuddly Clown" is a one piece knit polyester jumpsuit with substantial finish work. Customs determined the latter was fancy dress and all the others were not. See HQ 959545, June 2, 1997 (Ex. 3 to Plaintiff's Memo).

1990) ("contrary to the position adopted by Traveler's counsel, Customs believes that the nomenclature previously interpreted has changed and that a dissimilar interpretation is required by the text of the HTS regarding the classification of Halloween costumes.") (Ex. 10 to Plaintiff's Memo). Due to the negative impact of this reversal on domestic importers of costumes, Customs' decision was challenged again resulting in a settlement agreement providing that "all costumes of flimsy nature and construction lacking durability and generally recognized as not normal articles of apparel shall be classified as festive articles under section 95.05.9060." Settlement agreement between Traveler Trading Co., Inc., and the United States at 2 (Ex. 13 to Plaintiff's Memo). Customs subsequently issued Headquarters Ruling Letter ("HRL") 957318 on November 15, 1994, essentially reiterating the position taken within the agreement (i.e., that costumes of a flimsy nature and construction, lacking durability, and generally not recognized as normal articles of apparel are classifiable within Chapter 95 HTSUS). HQ 957318, Nov. 15, 1994 (Ex. 14 to Plaintiff's Memo).

On July 26, 1996, Plaintiff Rubie's, a domestic costume manufacturer, filed a Request for Information pursuant to 19 U.S.C. § 1516 and 19 C.F.R. § 175.1 requesting that Customs rule on the tariff classification of various textile costumes. See Ex.2 to Plaintiff's Memo. On June 2, 1997, Customs issued HRL 959545 determining that the merchandise was classified within subheading 9505.90.6090 (this provision was later amended to 9505.90.6000 with no pertinent changes). See Ex.3 to Plaintiff's Memo. Plaintiff subsequently filed a domestic interested party petition with Customs pursuant to 19 U.S.C. § 1516 and 19 C.F.R. § 175.11. On July 22, 1998, in response to Rubie's petition, Customs issued Headquarter Ruling 961447 denying the petition for reclassification of the costumes under Chapter 61 or Chapter 62, HTSUS, as "wearing apparel" and affirming their classification under Chapter 95, HTSUS, as "festive articles." Customs' rationale, as in HRL 957318, focused on the texture and quality of the materials as "flimsy and non-durable textile costumes whose principal intended use is for a one time festive

4

occasion are distinct from 'wearing apparel' which the courts have held to be used for decency, comfort, adornment or protection." HQ 961447, July 22, 1998. This texture and quality is to be determined by such factors as the extent of styling features such as zippers, inset panels, darts or hoops, and whether the edges of the materials had been left raw or finished. Id.

Subsequent to the issuance of HRL 961447, Rubie's timely filed a notice pursuant to 19 U.S.C. § 1516(c) and 19 C.F.R. § 175.23 contesting the decision in HRL 961447. On June 25, 1999, Customs notified Rubie's, pursuant to 19 U.S.C. § 1516(c) and 19 C.F.R. 175.25(h) that the entry of the "Scream Robe Costume", had been liquidated on that day. The entry in question, dated March 8, 1999, was liquidated as entered, free of duty, under Chapter 95, HTSUS, as "festive articles." On June 29, 1999, Rubie's commenced the current action to challenge Customs' classification of the subject merchandise claiming jurisdiction pursuant to 28 U.S.C. § 1581(b).

## III
### Arguments

### A. Plaintiff Argues the Subject Merchandise is Classifiable in Chapter 61 or 62 as "Wearing Apparel"

Rubie's argues that the imported textile costumes at issue are classifiable within either Chapter 61 or 62, HTSUS, covering articles of apparel and clothing accessories. More specifically, Plaintiff argues that the "Scream Robe Costume," liquidated free of duty as a "festive article" on June 25, 1999, is properly classifiable within subheading 6114.30.30, HTSUS, as an "other" knitted or crocheted garment with a duty rate of 15.5% ad valorem. Rubie's Complaint at ¶17. Although Plaintiff recognizes that Subheading 9505.90.6090, covering "festive, carnival or other entertainment articles," includes accessories such as plastic

swords or false noses, articles worn for Halloween or other similar costumed events, Plaintiff argues that Note 1(e) to Chapter 95 specifically excludes costumes of textile materials from the scope of "festive articles" as defined by the relevant provisions of Chapter 95. Rubie's Complaint at ¶¶ 19, 20. Note 1(e) to Chapter 95 specifically provides that Chapter 95 "does not cover . . . sports clothing or fancy dress, of textiles, of chapter 61 or 62." Plaintiff argues that "fancy dress" is synonymous with the word "costume" and consequently costumes of textile materials are excluded from Chapter 95 and properly classifiable within either Chapter 61 or 62 of the HTSUS. Id.; Plaintiff's Memo at 6.

### B. Defendant Argues the Subject Merchandise is Classifiable in Chapter 95 as a "Festive Article"

The Government argues that Customs properly classified the merchandise as "festive articles" within Chapter 95, HTSUS, because the costumes at issue are not "wearing apparel" in the context of Chapter 61 or 62 of the HTSUS. See Defendant's Opposition to Plaintiff's Motion for Summary Judgment and Cross-motion for Summary Judgment in its Favor ("Defendant's Opposition") at 5. Defendant contends that Note 1(e) to Chapter 95, excluding "fancy dress of textiles," refers to elaborate or substantial costumes such as those worn by actors in the theater, and formal wear worn to special events. See id. at 13. Consequently, it says, flimsy or non-durable costumes such as the merchandise in the present case are properly classifiable as "festive articles" within Chapter 95. The Government contends this criterion of separating costumes according to durability or quality was developed in order to accurately separate "festive articles" from "wearing apparel" and is in accordance with the General Rules of Interpretation. See id. at 20. The Government further argues that HRL 961447, the ruling denying Rubie's petition for reclassification, is entitled to deference as a reasonable interpretation of an ambiguous statute. See Id. at 7.

# IV
## Standard of Review

### A. Summary Judgment

Under USCIT R. 56(c), summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The moving party bears the burden of demonstrating the absence of all genuine issues of material fact. Avia Group Int'l, Inc. v. L.A. Gear California, Inc., 853 F.2d 1557, 1560 (Fed. Cir. 1988). This may be done by producing evidence showing the lack of any genuine issue of material fact or, where the non-moving party bears the burden of proof at trial, by demonstrating that the nonmovant has failed to make a sufficient showing to establish the existence of an element essential to its case. Id.; Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

To successfully oppose a properly supported motion for summary judgment, the nonmovant may not simply rest on its pleadings. Rather, it must produce evidence "by affidavits or as otherwise provided in [USCIT R. 56]" which "set forth specific facts showing that there is a genuine issue for trial." USCIT R. 56(e); see also Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987) ("[T]he party opposing summary judgment must show an evidentiary conflict on the record; mere denials or conclusory statements are not sufficient.").

In determining whether the parties have met their respective burdens, the Court does not "weigh the evidence and determine the truth of the matter," but simply determines "whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In so doing, the court views all evidence in a light most favorable to the nonmovant, drawing all

7

reasonable inferences in the nonmovant's favor. <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962); <u>Avia Group Int'l</u>, 853 F.2d at 1560.

## B. Summary Judgment and the "Presumption of Correctness"

The Government's classification decision is presumed to be correct, <u>see</u> 28 U.S.C. § 2639(a)(1) (1988 & Supp. V), and the party challenging the decision has the burden of overcoming the statutory presumption by a preponderance of the evidence. <u>See</u> <u>St. Paul Fire & Marine Ins. Co. v. United States</u>, 6 F.3d 763, 769 (Fed. Cir. 1993). Where however, there are no material facts in dispute and only questions of law remain, Plaintiff must show legal error to overcome the presumption of correctness. <u>See</u> <u>Commercial Aluminum Cookware Co. v. United States</u>, 20 CIT 1007, 1013, 938 F. Supp. 875, 881 (1996). If the court finds, because of evidence or other authority presented by Plaintiff, that the presumption has been overcome, this court must reach the correct classification on its own or after remand. <u>See</u> <u>Jarvis Clark Co. v. United States</u>, 733 F.2d 873, 878 (Fed. Cir. 1984). The present dispute is primarily a question of law, so the presumption of correctness does not apply. <u>Universal Elecs. Inc. v. United States</u>, 112 F.3d 488, 492 (Fed. Cir. 1997)(holding that "although the presumption of correctness applies to the ultimate classification decision . . . the presumption caries no force as to questions of law").

## C. Deference Owed to HRL 961447 Under <u>Mead</u>

The Supreme Court in <u>United States v. Mead Corp.</u>, 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001), articulated the degree of judicial deference owed to a challenged tariff customs classification. The Court held that "a tariff classification has no claim to judicial deference under Chevron, there being no indication that Congress intended such a ruling to carry the force of law . . . ." <u>Mead</u>, 121 S.Ct. at 2168. The "[d]elegation of such authority may be

8

shown in a variety of ways, as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent." Id. at 2171. The Court held that even if the ruling failed to meet this standard, it would still be eligible to claim respect according to its persuasiveness under Skidmore et al. v. Swift & Co., 323 U.S. 134 (1944). Id. at 2168. This persuasiveness will "depend upon the thoroughness evident in its consideration, *the validity of its reasoning*, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." Skidmore, 323 U.S. at 140 (emphasis added).

Customs decided the instant case based on a standard classification ruling and did not utilize notice and comment procedures. Consequently, this court will not afford the deference articulated in Chevron U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837, 843-45, 81 L.Ed.2d 694, 104 S.Ct. 2778 (1984), but will rather defer to Customs' classification ruling only to the extent it has the power to persuade. Because that ruling is both logically and factually defective it lacks that persuasive power. As the Federal Circuit noted in Thai Pineapple Canning Indus. Corp. v. United States, 273 F.3rd 1077, 1083 (Fed. Cir. 2001), ". . . if the Government's position is unreasonable, deference does the agency no good."

## V
## Analysis

When the point of contention is in which of two or more tariff classifications particular merchandise falls, the analysis that a court must undertake consists of two steps: "first, construe the relevant classification headings; and second, determine under which of the properly construed tariff terms the merchandise at issue falls." Bausch & Lomb Inc. v. United States, 148 F.3d 1363, 1365 (Fed. Cir. 1998); see also Universal Elecs., Inc. v. United States, 112 F.3d 488, 491 (Fed. Cir. 1997). Although this analysis entails issues of law and fact, the ultimate question

9

remains the proper classification of the merchandise within a particular heading. Bausch & Lomb Inc. v. United States, 148 F.3d 1363, 1365. Courts have consistently viewed this analysis as a question of law, as it is the meaning of the terms in the statute that is at issue. Id.; see also, Sports Graphics, Inc. v. United States, 24 F.3d 1390, 1391 (Fed. Cir. 1994); Universal Elecs., Inc. v. United States, 112 F.3d at 492.

The dispute in the present case revolves around the interpretation of provisions within Chapter 95 and Chapter 61 or 62 of the HTSUS. Chapter 95 covers "Toys, games and sports equipment; parts and accessories thereof", while Chapter 61 covers "Articles of apparel and clothing accessories, knitted or crocheted", and Chapter 62 "Articles of apparel and clothing accessories, not knitted or crocheted." The Government argues that the costumes at issue must be classified within subheading 9505.90.60 which provides for "articles, carnival or other entertainment articles, including magic tricks and practical joke articles; parts and accessories thereof: . . . other: . . . other:" at 0% duty. Plaintiff points to Note 1(e) of Chapter 95 which states that "this chapter does not cover . . . e) Sports clothing or fancy dress, of textiles, of chapter 61 or 62." Plaintiff therefore directs the court to chapters 61 or 62 for proper classification of the merchandise at issue. More specifically, Plaintiff points to subheading 6114.30.30 which provides for "other garments, knitted or crocheted: of man-made fibers: . . . other." Rubie's Complaint at ¶17.

The General Rules of Interpretation ("GRI") of the HTSUS govern the proper classification of merchandise. See Orlando Food Corp. v. United States, 140 F.3d 1437, 1439 (Fed. Cir. 1998). Pursuant to GRI 1, "classification shall be determined according to the terms of the headings and any relative section or chapter notes." GRI 1, HTSUS; see also Orlando Foods, 140 F.3d at 1440. Consequently, the terminology utilized within the relevant headings and notes is key for proper determination.

The central point of contention is whether the subject merchandise constitutes "fancy

10

dress, of textiles, of chapters 61 or 62," which would properly exclude it from Chapter 95 and place it in Chapter 61 or 62. The term "fancy dress" is not defined within the HTSUS. "When a tariff term is not defined in either the HTSUS or its legislative history, the term's correct meaning is its common meaning." Mita Copystar Am. v. United States, 21 F.3d 1079, 1082 (Fed. Cir. 1994) (citing Lynteq, Inc. v. United States, 976 F.2d 693, 697 (Fed. Cir. 1992). Moreover, in construing tariff terms "the court may rely upon its own understanding, dictionaries and other reliable sources." Medline Indus. Inc. v. United States, 62 F.3d 1407, 1409 (Fed. Cir. 1995) (citing Marubeni Am. Corp. v United States, 35 F.3d 530 (Fed. Cir. 1994). The court reviewed several dictionaries and found that the term "fancy dress" is indeed synonymous with "costumes" worn for masquerades or similar costumed events. Webster's Third New International Dictionary (Merriam-Webster, Inc. 3d. Ed. 1986) defines "fancy dress" as follows:

> Fancy dress n : a costume (as for a masquerade or party) departing from currently conventional style and usu. representing a fictional or historical character, an animal, the fancy of the wearer, or a particular occupation.

Id. at 822.

Plaintiff cites to the Cambridge International Dictionary of English which defines fancy dress as:

> (esp. Br and Aus) Fancy dress (Am usually costume, masquerade) is what you wear for a party where everyone dresses in special clothes as a particular type of character or thing: They came to the fancy-dress party dressed as two policewomen.

Plaintiff's Memo at 7-8 (quoting Cambridge International Dictionary of English (1995 ed.) at 503.

Plaintiff also cites to The Oxford English Dictionary (R.W. Burchfield ed., 2d ed. 1989), which defines "fancy dress" as "[a] costume arranged according to the wearer's fancy, usually representing some fictitious or historical character," id. At 716, and Mary Brooks Picken's The

Fashion Dictionary (3d. ed. 1973) which states that "fancy dress" is a "costume representing a nation, class, calling, etc., as worn to a costume ball or masquerade party." Id. at 134; Plaintiff's Memo, page 7-8.

Finally, The American Heritage Dictionary defines "fancy dress" as "a masquerade costume". The American Heritage Dictionary at 489. It further defines a "masquerade" as "1.a. A costume party at which masks are worn; masked ball. b. A costume for such a party or ball." Id. at 770 (emphasis added). From these definitions, it is clear that "fancy dress" undeniably signifies "costume" and that the term is not limited to formal balls.

Although Defendant admits that "fancy dress" may include costumes, Defendant's interpretation of the term focuses on the adjective "fancy," as in "of superfine quality," rather than the phrase "fancy dress." Defendant's Opposition at 12-13. This reading leads Defendant to the conclusion that "fancy dress" of the kind excluded from Chapter 95 consists of elaborate or substantial costumes such as those worn by actors in the theater, and formal wear such as tuxedos and ball gowns worn to special events. Id. at 13. Defendant further argues that this definition requires the imposition of a criterion separating flimsy costumes from elaborate or substantial costumes, the latter falling within the purview Note 1(e) and thereby excluded from Chapter 95. Id.[4]

---

[4] Defendant argues that the meaning of "fancy dress" as a "costume" is a foreign usage. See Defendant's Opposition and Cross at 14. Prior to oral argument the court asked the parties to address a Google.com, www.google.com, search of the term "fancy dress ball" which indicated to the court that the term meant more than high end parties and that it indeed often signified inexpensive "costumes" in the United States as well. At oral argument counsel for Amicus provided the court computer searches of the terms "fancy dress" and "fancy dress ball."it claimed were representative of "the vast universe of materials on the internet," and that they ". . . make it very clear that not only in the category of fancy dress balls, in which attire is semi-formal and formal, but in the other fancy dress affairs . . . where the idea is to put as much effort, energy, money, style, into the costume as possible; that the kind of merchandise that's at issue in this case could not, . . . under any conceivable reasonable view be . . . in any way connected with those events."

The court further searched Google using the term "fancy dress" finding the term is commonly used in the United States in ways not limited to the meaning ascribed by the Government and

To support this contention Defendant cites to Traveler Trading, 13 CIT 380, a case where "the costumes which were intended for adults had been classified under the TSUS, as wearing apparel by the Customs Service and the importer argued that they should be classified as toys, as were similar costumes intended for children." Defendant's Opposition at 15. The court held that ". . . given the flimsy construction and nature of these costumes, they have no practical application as wearing apparel and serve only to amuse. Accordingly, the Court finds that defendant has failed to show a reasonable basis in fact or law for its position at the administrative level in classifying these adult costumes as wearing apparel." Traveler Trading, 13 CIT at 383. The Traveler Trading decision was not, however, decided under the HTSUS, and as Plaintiff correctly points out "this decision pertained to the classification of costumes under the TSUS under which the interpretation of "fancy dress" was not an issue. As such, the decision is neither applicable nor controlling here." Plaintiff's Memo at 13. As was noted in the House Conf.

---

Amicus. Thus, for example, the court found a web page for the United States Power Squadrons in South Florida which described parties as "fancy dress affairs with prizes for the best costumes." They "are casual events where uniforms and ceremony are forgotten." www.usps.org/localusps/d22/pastevents.htm. Attached were photographs of participants in "Roman" dress. The costumes were clearly homemade. They could not be described as involving "as much effort, energy, money, style . . . as possible." In addition, Guns and Ammo on line, www.gunsandammomag.com/dynamic.asp?intSectionID=213&intArticleID=2274, describes "cowboy shooting" satisfying ". . . a strong urge to get up in fancy dress and go play acting," and Holly's Dog Training, www.ctcv.org/events/index2.htm from Southern California describes a visit to Mexico where ". . . we did much partying (including fancy dress on the very-important-to-Mexicans Day of the Dead." Johns Hopkins University, www.jhu.edu/~hr1/human-serv/diversity_summary.html, in Baltimore, Maryland, in explaining the Jewish holiday Purim, describes it as involving "Jews in fancy dress. . ." Time magazine, www.time.com/time/magazine/1997/int/970804/spl.america_the_b.html describes the clothes at a party hosted by then President Bill Clinton where guests ". . . were asked to trick themselves out . . . in jeans, cowboy hats and boots," as "fancy dress." Finally, XTREME Radio www.xtremeradio.com/freak_news.shtml in Las Vegas, Nevada, describes a home-made costume worn by a Michigan high-school student ". . . to wear at his school's Halloween fancy dress contest."

There were numerous others examples in the United States showing similar usages of fancy dress for elementary school events and sale of cheap Halloween costume accessories. These usages belie Amicus' representation.

13

Rept., "[i]n light of the significant number and nature of changes in nomenclature from the TSUS to the HTS, decisions by the Customs Service and the courts interpreting nomenclature under the TSUS are not to be deemed dispositive in interpreting the HTS." House Conference Rep. No. 100-576 at 549 (1988). The TSUS never contained the term "fancy dress" nor did it contain a provision for festive articles. Consequently the issue of whether textile costumes are properly classifiable as wearing apparel or festive articles never arose in Traveler Trading.

The criteria of flimsiness under the Traveler Trading decision is inapplicable in the present case for precisely the same reasons. The HTSUS specifically provides for the exclusion of "fancy dress" from Chapter 95, consequently if the item constitutes "fancy dress" it will be excluded; if it does not and is a festive article, it will be included. As previously noted by various courts, resort to the TSUS is not necessary where the statutory language of the HTSUS is clear. Amity Leather Company v. United States, 20 CIT 1049, 1054, 939 F. Supp. 891, 896 (1996) (citing Pima Western, Inc. v. United States, 20 CIT 110, 915 F. Supp. 399 (1996). Proper classification therefore turns on the term "fancy dress" and the criteria of flimsiness is thereby rendered irrelevant under the HTSUS.

The court examined the definitions of the term "fancy dress" and finds Defendant's analysis incongruent with the obvious meaning of "fancy dress."[5] An overview of relevant definitions indicates that "fancy dress" signifies "costume" as worn at Halloween or other similar events. Moreover, it is simply incongruous that a reference to tuxedos and ball gowns would be included within the Notes of Chapter 95 which covers "Toys, Games and Sports Equipment: Parts and accessories thereof." While a Halloween costume might arguably be considered an

---

[5] The court has examined the sample "Scream" costume submitted by Customs as well as photographic descriptions of the "Witch of the Webs" costume which is a child "size knit polyester black dress that falls in raw edged points just below the knee" and which Customs says does not constitute an item of wearing apparel. See HQ 959545, June 2, 1997 (Ex. 3 to Plaintiff's memo). That examination shows garments which, might be unusual, but would certainly not be indecent or too flimsy for a child to wear in warm weather.

accouterment to a toy or game, a tuxedo or ball gown simply can not. It is reasonable to read this note as a direct decision to exclude clown suits from inclusion in the chapter; it is unreasonable to read it as excluding tuxedos. Consequently, the court rejects Defendant's arguments with regard to "fancy dress."

Finally, Plaintiff raises the ejusdem generis rule of construction in arguing that costumes are excluded from Chapter 95. Plaintiff's Memo In Opposition To Defendant's Cross Motion For Summary Judgment at 18-20. The rule provides that "where general words follow the enumeration of particular classes of things, the general words will be construed as applying only to things of the same general class as those enumerated." Black's Law Dictionary (West Publishing, Co. 6th ed.) at 517. In its memo Plaintiff argues that "the Explanatory Note to Heading 9505 provides that the heading covers festive, carnival and other entertainment articles which include: articles of fancy dress, e.g., masks, false ears and noses, wigs, false beards and mustaches and paper hats. Applying the rule of ejusdem generis, it would defy all logic to assert that the subject clothes are of the same class or kind as masks, false ears and noses." Defendant argues that "even if ejusdem generis were applicable to the Explanatory Note statement, the flimsy Halloween costumes which are used for amusement more than anything else are more alike to the examples listed, which are similarly intended for amusement and/or disguise, than they are to the wearing apparel of Chapters 61 and 62." Defendant's Reply to Plaintiff's Opposition to Defendant's Cross-Motion For Summary Judgment in Its Favor at 17. The court finds that it is clear that masks, wigs and similar articles are of a different kind than textile costumes as they clearly constitute an accessory to a costume rather than wearing apparel.

Since it is only "fancy dress" belonging to Chapter 61 or 62 that is excluded from Chapter 95, it is not sufficient to simply determine the significance of the term "fancy dress" but rather it becomes necessary to determine the scope of Chapter 61 and 62 as well. Chapter 61 covers "Articles of Apparel and Clothing Accessories, Knitted or Crocheted," and Chapter 62 "Articles

15

of Apparel and Clothing Accessories, not Knitted or Crocheted." The Supreme Court in Arnold v. United States, 147 U.S. 494, 496 (1893) defined the term "wearing apparel" as "not an uncommon one in statutes, and . . . used in an inclusive sense as embracing all articles which are ordinarily worn – dress in general."[6] Moreover, in H.I.M./ Fathom, Inc. v. United States, 21 CIT 776, 981 F. Supp. 610 (1997), the court examined the definition of "clothing" and concluded that wetsuits would properly fall within that definition as they were articles worn as an outer covering for the human body at a particular time. Fathom, 981 F.Supp. at 615. The court in Fathom also concluded that "the language of the HTSUS, in contrast to the TSUS, evidences statutory intent that articles are not classified within the garment provisions primarily based on use." Id. at 617. The court went on to state that "while classification by use under certain sections of the HTSUS can be implied from the language of the headings . . . the garment provisions involved, Chapters 61 and 62, are not use provisions." Id. Finally, the court concluded that it is the garment's fabric as either knitted or woven that was of crucial importance for the subheading at issue in Fathom, (i.e. TSUS heading 6113.) Id. Consequently, in order for merchandise to be properly classified within Chapters 61 or 62, strong emphasis must be placed on the material of the merchandise and whether it could be worn at a particular time.

In the present case, it is Halloween costumes of textile materials that are at issue. These are articles that are meant to adorn the human body at a particular time, either on Halloween or at any other event where the wearer desires to mimic another. They fall well within the norms of apparel as it is viewed in the United States; outer garments which provides at least minimal

---

[6] Plaintiff seems to be drawing a distinction between "articles of apparel" and "wearing apparel," however the court finds these terms interchangeable in the present instance. See Plaintiff's Memorandum in Opposition to Defendant's Cross Motion for Summary Judgment at 17. The noun "apparel" is commonly defined as "a person's clothing." Webster's Third New International Dictionary at 102. Consequently, whether the term is preceded by a present participle, i.e. "wearing," describing what it does rather than a noun, i.e. "article," describing what it is, does not make a difference.

16

decency and which sends the world a message about the wearer through their appearance or use. See id. at 15. The fact that such garments may fail to constitute clothing worn by most on a daily basis does not negate their inherent nature as articles of clothing. Consequently, as the merchandise at issue is made of textiles and designed to be worn it is properly classifiable within subheading 6114.30.30 of the HTSUS.

## VI
## Conclusion

Note 1(e) to Chapter 95 excludes "fancy dress, of textiles, of Chapter 61 or 62" from the Chapter. As the costumes at issue in the present constitute fancy dress of textile, and are wearing apparel, they are classifiable in Chapter 61.

For the foregoing reasons, Plaintiff's Motion For Summary Judgment is granted in full, and Defendant's Cross-Motion For Summary Judgment is denied.

_____
Evan J. Wallach, Judge

Date: February 19, 2002
New York, New York