**RUBIE'S COSTUME COMPANY,**
Plaintiff–Appellee,

v.

**UNITED STATES, Defendant–**
Appellant.

No. 02–1373.

United States Court of Appeals,
Federal Circuit.

Aug. 1, 2003.

V. James Adduci, II, Adduci, Mastriani & Schaumberg, LLP, of Washington, DC, argued for plaintiff-appellee. With him on the brief was David F. Nickel. Of counsel was Mark N. Bravin, Morgan, Lewis & Bockius LLP, of Washington, DC.

Saul Davis, Attorney, International Trade Field Office, Department of Justice, of New York, NY, argued for defendant-appellant. On the brief were Robert D. McCallum, Jr., Associate Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC; and John J. Mahon, Acting Attorney in Charge, International Trade Field Office. Of counsel on the brief was Beth C. Brotman, Attorney, Office of Assistant Chief Counsel, United States Customs Service, of New York, NY.

Marjorie M. Shostak, Stein Shostak Shostak & O'Hara, of Los Angeles, CA, for amicus curiae Creative Designs International Ltd., Peachtree Playthings, What Kids Want, and the Toy Association of Southern California. With her on the brief were S. Richard Shostak, Bruce N. Shulman, and Heather C. Litman.

Mark N. Bravin, Morgan, Lewis & Bockius LLP, of Washington, DC, for amicus curiae the Paper Magic Group, Inc. and Fun World/Easter Unlimited, Inc. With him on the brief was Rachel B. Irish.

Before NEWMAN, BRYSON, and GAJARSA, Circuit Judges.

Opinion for the court filed by Circuit Judge GAJARSA; Dissenting opinion filed by Circuit Judge BRYSON.

GAJARSA, Circuit Judge.

The United States ("government") appeals the final decision of the United

States Court of International Trade granting the motion for summary judgment to Rubie's Costume Company ("Rubie's") on the grounds that the classification of certain Halloween costumes by the United States Customs Service ("Customs") as "Festive, carnival or other entertainment articles, including magic tricks and practical joke articles; parts and accessories thereof: Other: Other" ("festive articles") under subheading 9505.90.6000, Harmonized Tariff Schedule of the United States ("HTSUS") [1] was erroneous and that the costumes are properly classified as "Other garments, knitted or crocheted: Of manmade fibers: Other" ("wearing apparel") under subheading 6114.30.30, HTSUS. *Rubie's Costume Co. v. United States*, 196 F.Supp.2d 1320 (Ct. Int'l Trade 2002). Because we conclude that Customs's classification ruling is persuasive and therefore must be granted deference under *Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944), we reverse.

## I. BACKGROUND

The merchandise at issue comprises textile costumes, which are made in toddler, child, and adult sizes traditionally worn in conjunction with the celebration of Halloween or to costume parties. On July 26, 1996, Rubie's filed a Request for Information, seeking a tariff classification for five textile costumes: "Witch of the Webs", "Abdul Sheik of Arabia," "Pirate Boy,"

"Witch," and "Cute and Cuddly Clown." [2] *See* 19 U.S.C. § 1516(a)(1) (2000); 19 C.F.R. § 175.1 (2003). In response to Rubie's request, Customs issued Headquarters Ruling Letter ("HQ") 959545, determining that the "Cute and Cuddly Clown" would be classified as "Babies' garments and clothing accessories" with a duty rate of 16.7 (now 16.1) percent *ad valorem,* while the other costumes ("imports" or "subject merchandise") would be classified as "festive articles," requiring duty-free entry under the general column one rate of duty. *See* HQ 959545 (June 2, 1997).

On July 7, 1997, Rubie's filed a Domestic Interested Party Petition, asserting classification of all imported textile costumes as articles of apparel in Chapter 61 or 62, HTSUS. *See* 19 U.S.C. § 1516; 19 C.F.R. § 175 (2003). Rubie's, the largest manufacturer of costumes in the United States, contended that virtually identical costumes to those manufactured by Rubie's were being imported into the United States and some of these textile costumes were being erroneously classified as festive articles, requiring duty-free treatment. Customs published a notice of receipt of Rubie's petition and solicited written comments regarding the petition from interested parties. Receipt of Domestic Interested Party Petition Concerning Tariff Classification of Textile Costumes, 62 Fed.Reg. 66,891 (Dec. 22, 1997); *see also* 19 U.S.C. § 1516; 19 C.F.R. § 175.21(a) (2003). The com-

---

1. References to the HTSUS throughout this opinion are to the 15th edition, revision 2, published on April 15, 2003. *See* HTSUS (2003), *at* http://dataweb.usitc.gov/SCRIPTS/tariff/toc.html.

2. The "Witch of the Webs" costume is a child size knit polyester black dress that falls in raw edged points just below the knee. The "Abdul, Sheik of Arabia" costume is an adult size

ankle length sheath of knit polyester with some unfinished edges. The "Pirate Boy" is a child size costume made up of separate top and pants of knit polyester with raw edged points at sleeves and waist. The "Witch" costume is a child size long sleeved black dress of knit polyester with raw edged points. The "Cute and Cuddly Clown" is a one piece knit oyster jumpsuit with substantial finish work.

ment period closed on February 20, 1998, and Customs received numerous comments in support of, and in opposition to, the reclassification.

In HQ 961447, Customs denied Rubie's petition requesting reclassification and affirmed the classification in HQ 959545, in which four of the five textile costumes were classified as "festive articles" because they were found to be flimsy, non-durable, and not normal articles of wearing apparel. *See* HQ 961447 (July 22, 1998). Customs rejected Rubie's argument that imported costumes made of textiles should be classified under Chapter 61 or 62, HTSUS, as items of apparel. *Id.*

HQ 961447 reviewed the history of the classification of flimsy Halloween costumes under both the HTSUS and its predecessor, the Tariff Schedules of the United States ("TSUS"). Under the TSUS, Customs classified children's costumes as "toys" and adult Halloween costumes as "wearing apparel." HQ 082626 (Sept. 29, 1988). This classification of adult costumes as "wearing apparel" was challenged by domestic importers in *Traveler Trading Co. v. United States*, 713 F.Supp. 409 (Ct. Int'l Trade 1989), which resulted in Customs changing its position and classifying certain adult costumes as toys due to their flimsy construction and lack of utilitarian value. Subsequent to the implementation of the HTSUS in 1989, Customs reversed its position and classified all textile costumes as wearing apparel. HQ 087291 (Dec. 4, 1990); *see also* HQ 084103, 1989 WL 380930 (Customs) (July 27, 1989). In September of 1994, Customs entered into a settlement agreement with Traveler Trading Co., Inc. ("Settlement Agreement"), agreeing to classify all costumes of

a flimsy nature and lacking in durability as festive articles. After entering into the Settlement Agreement, Customs issued HQ 957318, classifying textile costumes of a flimsy nature and construction, lacking in durability, and generally recognized as not being normal articles of apparel as "festive articles." HQ 957318, 1994 WL 830448 (Customs) (Nov. 15, 1994).

Customs published notice of the denial of the Domestic Interested Party Petition and notice of Rubie's desire to contest HQ 961447. Denial of Domestic Interested Party Petition; Petitioner's Desire to Contest Decision Concerning Tariff Classification of Textile Costumes, 63 Fed.Reg. 67,-170 (Dec. 4, 1998); *see also* 19 U.S.C. § 1516; 19 C.F.R. § 175.24 (2003). On June 29, 1999, Customs notified Rubie's that the entry of the "Scream Robe Costume,"[3] had been liquidated as "festive articles," requiring duty-free treatment. *See* 19 U.S.C. § 1516(c); 19 C.F.R. § 175.25(b) (2003).

Subsequently, Rubie's filed a complaint in the Court of International Trade challenging HQ 961447. The Court of International Trade held that HQ 961447 should not be afforded the deference articulated in *Skidmore* "[b]ecause that ruling is both logically and factually defective." *Rubie's Costume*, 196 F.Supp.2d at 1326. Instead, the Court of International Trade determined that the imports fall within the exclusion for "fancy dress, of textiles, of chapter 61 or 62," in Note 1(e), which precludes classification of the imports as "festive articles." *Id.* at 1331. The Court of International Trade reasoned that "the phrase ['fancy dress'] includes both types of clothing; the formal and expensive, and the cheap and flimsy." *Id.* at 1322. Ac-

---

**3.** The "Scream Robe Costume" is a "one-size-fits all," ankle length, black robe made of knitted 100 percent polyester with a hood, belt, and "ghost-face" mask.

cordingly, the Court of International Trade granted the motion for summary judgment to Rubie's. *Id.* The government timely appealed, and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

## II. STANDARD OF REVIEW

■■■■ We review a grant of summary judgment by the Court of International Trade *de novo.* *Mead Corp. v. United States,* 283 F.3d 1342, 1345 (Fed.Cir.2002). We accord a classification ruling by Customs a measure of deference proportional to its "power to persuade." *United States v. Mead Corp.,* 533 U.S. 218, 235, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (quoting *Skidmore,* 323 U.S. at 140, 65 S.Ct. 161). While we recognize the responsibility to accord a classification ruling the degree of deference commensurate with its power to persuade, we also recognize our independent responsibility to decide the legal issue regarding the proper meaning and scope of tariff terms. *Rocknel Fastener, Inc. v. United States,* 267 F.3d 1354, 1358 (Fed. Cir.2001).

## III. DISCUSSION

*A.*

This case presents the question of whether HQ 961447, in which Customs determined that textile costumes of a flimsy nature and construction, lacking in durability, and generally recognized as not being normal articles of apparel are classifiable as "festive articles" and hence qualify for duty-free treatment, merits *Skidmore* deference because of its power to persuade.

The government and *amicus curiae* argue that HQ 961447 should be accorded *Chevron* deference, *Chevron U.S.A. Inc. v.*

*Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), because the classification ruling was published pursuant to a deliberative notice-and-comment rulemaking process. In the alternative, the government argues that the Court of International Trade failed to afford HQ 961447 *Skidmore* deference by improperly substituting its own judgment for that of Customs. Specifically, the government argues that the imports are not "fancy dress, of textiles, *of chapter 61 or 62*" (emphasis added), because they are costumes of a flimsy nature and construction, lacking in durability, and generally recognized as not being normal articles of apparel. In contrast, the government contends Note 1(e) refers to substantial costumes such as those worn by actors in the theater, formal wear worn to special events, or "wearing apparel" in the sense they are designed or constructed to be used for decency, comfort, adornment, or protection.

Rubie's responds that HQ 961447 is entitled to minimal deference under *Skidmore,* because Note 1(e), excluding "fancy dress, of textiles, of chapter 61 or 62" from Chapter 95, HTSUS, precludes classification of the imports as "festive articles." Specifically, Rubie's asserts that Customs's interpretation of the term "fancy dress" is erroneous because the term "fancy dress" is synonymous with the word "costume." Rubie's, citing the Explanatory Notes to Chapter 95, HTSUS, argues that the examples set forth as "articles of fancy dress" include only items that act as accessories to costumes but are not themselves "fancy dress" because they do not clothe the body. Furthermore, Rubie's states that the durability of the costume is irrelevant to the determination whether a costume is an item of apparel.

For the reasons that follow, we conclude that Customs's determination that import-

ed textile costumes of a flimsy nature and construction, lacking in durability, and generally recognized as not being normal articles of apparel are classifiable as "festive articles," merits deference under *Skidmore* because of its power to persuade.

B.

■ We first reject the argument of the government and *amicus curiae* that classification rulings published pursuant to a deliberative notice-and-comment rulemaking process are entitled to *Chevron* deference. The Supreme Court in *Mead* considered the similar issue of "whether a tariff classification ruling by the United States Customs Service deserves judicial deference." *Mead*, 533 U.S. at 221, 121 S.Ct. 2164. In holding that classification rulings are entitled to *Skidmore* deference, the Court reasoned that Customs "classification rulings are best treated like 'interpretations contained in policy statements, agency manuals, and enforcement guidelines.' They are beyond the *Chevron* pale." *Id.* at 234, 121 S.Ct. 2164 (quoting *Christensen v. Harris County*, 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000)) (citation omitted). The Court continued:

> To agree with the Court of Appeals that Customs ruling letters do not fall within *Chevron* is not, however, to place them outside the pale of any deference whatever. *Chevron* did nothing to eliminate *Skidmore*'s holding that an agency's interpretation may merit some deference whatever its form, given the "specialized experience and broader investigations and information" available to the agency, and given the value of uniformity in its administrative and judicial understandings of what a national law requires.

*Id.* at 234–35, 121 S.Ct. 2164 (quoting *Skidmore*, 323 U.S. at 139, 65 S.Ct. 161) (citations omitted).

Taking particular note of Customs's "specialized experience" in classifying goods, *id.* at 235, 65 S.Ct. 161, the Court determined that a "classification ruling ... may ... at least seek respect proportional to its 'power to persuade,'" *id.* (quoting *Skidmore*, 323 U.S. at 140, 65 S.Ct. 161) (citations omitted). The Court stated that "[s]uch a ruling may surely claim the merit of its writer's thoroughness, logic and expertness, its fit with prior interpretations, and any other sources of weight." *Id.*

Although the classification ruling before the Supreme Court in *Mead* was not issued in response to a Domestic Interested Party Petition, 19 U.S.C. § 1516, and therefore was not subject to a deliberative notice-and-comment rulemaking process, we read the Court's holding as applying to all Customs classification rulings. *Heartland By–Prods., Inc. v. United States*, 264 F.3d 1126, 1135 (Fed.Cir.2001); *see Mead*, 533 U.S. at 234, 121 S.Ct. 2164 ("The statutory changes [requiring a notice-and-comment period when Customs determines that the matter is of sufficient importance to involve the interests of the domestic industry] reveal no new congressional objective of treating classification decisions generally as rulemaking with force of law, nor do they suggest any intent to create a *Chevron* patchwork of classification rulings, some with force of law, some without. In sum, classification rulings ... are beyond the *Chevron* pale."). We therefore review HQ 961447, the classification ruling of the imports, in accordance with *Mead* and *Skidmore*.

C.

■ *Mead* indicates that the following factors are to be evaluated when determining the degree of deference to accord a Customs classification ruling: "its writer's thoroughness, logic and expertness, its fit

with prior interpretations, and any other sources of weight." *Mead*, 533 U.S. at 235, 121 S.Ct. 2164. Those factors echo the factors set forth in *Skidmore* for determining the weight to accord an administrative ruling, interpretation, or opinion:

We consider that the rulings, interpretations, and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give power to persuade, if lacking power to control.

323 U.S. at 140, 65 S.Ct. 161. Applying these factors to the classification of the subject merchandise, we determine that HQ 961447 is entitled to *Skidmore* deference because of its power to persuade.

First, HQ 961447 was adopted pursuant to a deliberative notice-and-comment rulemaking process. Customs published notice of Rubie's Domestic Interested Party Petition, with a description of the class of imported merchandise and the classification issue in dispute, in the Federal Register pursuant to 19 C.F.R. § 175.21. 62 Fed.Reg. at 66,892. The notice provided the public with sixty days to comment on the classification issue raised by the petition and 767 comments were received in response to the notice. 63 Fed.Reg. at 67,170. Thereafter, Customs published a notice of denial in the Federal Register, specifically referencing and adopting HQ 961447, denying the petition for reclassification of the costumes as "wearing apparel," and affirming their classification as "festive articles." *Id.* at 67,171. We therefore conclude that Customs gave thorough consideration to HQ 961447.

Second, we note that Customs has "specialized experience" in classifying goods. *Mead*, 533 U.S. at 234, 121 S.Ct. 2164. Note 1(e) excludes "fancy dress, of textiles, of chapter 61 or 62" from Chapter 95, HTSUS. The relevant provision of the HTSUS, however, does not define the critical phrase "fancy dress, of textiles, of chapter 61 or 62." Customs therefore had to interpret the phrase in order to distinguish between costumes of Chapter 95 ("festive articles") and fancy dress of Chapter 61 or 62 ("wearing apparel"). *See* HQ 961447. Customs determined that "fancy dress ... of chapter 61 or 62" refers to elaborate or substantial costumes such as "expensive, well-constructed ballroom gowns, safari outfits, certain types of uniforms, and other adult garments." *Id.* Customs concluded that, while the imports have some characteristics of textile apparel, the "flimsy and non-durable textile costumes whose principal intended use is for a one time festive occasion are distinct from 'wearing apparel' which courts have held to be used for decency, comfort, adornment or protection." *Id.* (citations omitted).

■ Because the HTSUS offers no definition for the term "fancy dress," the Court of International Trade correctly consulted the common (dictionary) meaning of the term. *See E.M. Chems. v. United States*, 920 F.2d 910, 913 (Fed.Cir.1990). As the Court of International Trade found, the relevant definition of "fancy dress" is "a costume (as for a masquerade or party) departing from conventional style and usu. representing a fictional or historical character, an animal, the fancy of the wearer,

or a particular occupation." *Rubie's Costume*, 196 F.Supp.2d at 1327 (citing *Webster's Third New International Dictionary* 822 (1986)). That the term "fancy dress," as found by the Court of International Trade, includes costumes is plain enough; however, a reading of the exclusion in Note 1(e) to Chapter 95, HTSUS, that focuses solely on the term "fancy dress" and turns a blind eye to the immediately following words "of textiles, of chapter 61 or 62" construes the term fancy dress in disregard of the context of the exclusion as a whole.

■■■ Fundamentally, courts interpret statutory language to carry out legislative intent. *Nippon Kogaku (USA), Inc. v. United States*, 69 C.C.P.A. 89, 673 F.2d 380, 383 (CCPA 1982). The first source for determining legislative intent is the statutory language. *United States v. Esso Standard Oil Co.*, 42 C.C.P.A. 144, 155 (1955). The words in Note 1(e) "of textiles, of chapter 61 or 62" immediately following "fancy dress," establish the context in which the term "fancy dress" is to be applied, and thereby circumscribe, qualify, and limit the type of "fancy dress" that was intended by the drafters to be excluded from Chapter 95, HTSUS, to textile costumes falling within the purview "of chapter 61 or 62." Thus, based on the common meaning of "fancy dress" and the ensuing language in Note 1(e), this court concludes that the exclusion to Chapter 95, HTSUS, encompasses textile costumes that are classifiable as "wearing apparel" under Chapter 61 or 62.

An understanding of what is an article of apparel begins with the Supreme Court's decision in *Arnold v. United States*, 147 U.S. 494, 13 S.Ct. 406, 37 L.Ed. 253 (1893), where the Court stated:

The term "wearing apparel" is not an uncommon one in statutes, and is used in an inclusive sense as embracing all articles which are *ordinarily* worn— dress in general.

*Id.* at 496, 13 S.Ct. 406 (emphasis added). The Customs Court in *Antonio Pompeo v. United States*, 40 Cust. Ct. 362 (1958), further developed this definition:

[W]earing apparel refers to clothes or coverings for the human body worn for decency or comfort and common knowledge indicates that adornment is also an element of many articles of wearing apparel.

*Id.* at 364.

Cognizant of these definitions, Customs's classification ruling in HQ 961447 is supported by a logical and well-reasoned explanation, a third factor lending further persuasiveness to its ruling. HQ 961447, as in HQ 957318, presents the correct classification as "festive articles" of flimsy, non-durable costumes having utility and used as well for festive occasions, based on functional or structural deficiencies as compared with the standard counterpart articles (e.g., wearing apparel). Customs focused on the texture and quality of the materials as "flimsy and non-durable textile costumes whose principal intended use is for a one time festive occasion [which] are distinct from 'wearing apparel' which the courts have held to be used for decency, comfort, adornment or protection." HQ 961447. Customs reasons that the texture and quality of the materials is to be determined by such factors as the extent of styling features such as zippers, inset panels, darts or hoops, and whether the edges of the materials had been left raw or finished. *Id.; see also* HQ 957948 (May 7, 1996) (setting forth certain styling and sewing features of costumes which exemplify the characteristics of "textile articles of fancy dress" under Chapter 61 or 62); HQ 957952 (May 7, 1996) (same).

While the imports may simulate the structural features of wearing apparel, and have some incidents of "clothes or coverings for the human body worn for decency or comfort," *Antonio*, 40 Cust. Ct. at 364, they are not practical "articles which are ordinarily worn," *Arnold*, 147 U.S. at 496, 13 S.Ct. 406. Rather, the Halloween costumes for consumers have enormous "make believe" or festive value during appropriate occasions such as Halloween and incidentally afford the element of covering for decency or comfort. To the extent that such elements have any characteristics similar to "wearing apparel" to consumers of Halloween costumes, such features are clearly secondary to the costumes' festive value.

In addition to the festive value fostered by the imports' features of styling, and of course, the simulation of fictitious characters, the subject merchandise such as the "one-size-fits-all" Scream Robe Costume has accessories such as a hood, belt, and "ghost-face" mask that further serve to enhance the festive value of imitating a character during Halloween or at a costume party. While an adult or child might wear a "one-size-fits-all" costume with its attendant accessories for decency or comfort, such benefits are incidental and the imports are primarily created for Halloween fun, strongly promoting festive value rather than cognitive association as wearing apparel. Such costumes are generally recognized as not being normal articles of apparel. Accordingly, we conclude that HQ 961447, determining that textile costumes of a flimsy nature and construction, lacking in durability, and generally recognized as not being normal articles of apparel are classifiable as "festive articles," is persuasive.

The only factor that weighs against giving deference to HQ 961447 is that the classification of textile costumes has long been the subject of controversy. HQ 961447, however, was neither a sudden and unexpected change, nor a failure to take account of a prior inconsistent interpretation. On the contrary, HQ 961447 *reiterated* the position Customs had followed consistently for almost ten years and did so with a "logical and well reasoned explanation." *Heartland*, 264 F.3d at 1135. As HQ 961447 notes:

> Customs reviewed the recent court case under the Harmonized Tariff and determined that it was clear the earlier decision under the TSUS in which the court had taken the Government to task for classifying costumes as wearing apparel would have been very persuasive to the court in rendering a decision under the HTSUSA. Thus, Customs reexamined its view regarding the scope of the term fancy dress as it relates to costumes.

HQ 961447. After the Settlement Agreement, HQ 957318 was issued, stating "that [Customs] would classify as festive articles in subheading 9505.90.60–6000(EN), HTSUSA, all imported textile costumes of flimsy nature and construction, lacking in durability and generally recognized as not being normal articles of apparel." *Id.* HQ 957318, which was affirmed by HQ 961447, of course, changed Customs's position regarding the classification of adult textile costumes as "wearing apparel" under the preceding TSUS. Nevertheless, "the mere fact that an agency contradicts a prior agency position is not fatal." *Smiley v. Citibank (S.D.), N.A.,* 517 U.S. 735, 742, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996). We conclude that a classification ruling, such as HQ 961447, which was consistently applied for almost ten years and was neither a sudden and unexpected change nor a failure to take account of prior inconsistent

interpretations, has "power to persuade," *Skidmore*, 323 U.S. at 140, 65 S.Ct. 161.

The Court of International Trade erred in not affording HQ 961447 *Skidmore* deference, *Rubie's Costumes*, 196 F.Supp.2d. at 1326, and in determining that, because "[a]n overview of several relevant dictionaries indicates that 'fancy dress' signifies 'costume,'" *id.* at 1330, "fancy dress, of textiles, of chapter 61 or 62" therefore encompasses flimsy, non-durable Halloween costumes under the HTSUS.

■ The Court of International Trade's holding that the imports are not classifiable as "festive articles" was also based on the Explanatory Notes to Chapter 95, HTSUS. *Id.* The Explanatory Notes pertaining to heading 9505, HTSUS, indicate that the heading includes:

> (A) Festive, carnival or other entertainment articles, which in view of their intended use are generally made of non-durable material. They include: ... (3) Articles of fancy dress, e.g., masks, false ears and noses, wigs, false beards and moustaches (not being articles of postiche [4]—heading 67.04 [5]) and paper hats. However, the heading excludes fancy dress of textile materials, of chapters 61 or 62.

Explanatory Notes, 9505, HTSUS. The Court of International Trade found "that it is clear that masks, wigs and similar articles are of a different kind than textile costumes as they clearly constitute an accessory to a costume rather than wearing apparel." *Rubie's Costumes*, 196 F.Supp.2d. at 1330.

■ Although the examples in the Explanatory Notes are probative and sometimes illuminating, we shall not employ their limiting characteristics, to the extent there are any, to narrow the language of the classification heading itself. Nothing from the pertinent subheading 9505.90.6000—"Festive, carnival or other entertainment articles: Other: Other"— limits 9505.90.6000 only to accessories. Absent a clearer showing of congressional intent, we refuse to import incidental characteristics of the examples in the Explanatory Notes into the headings of the HTSUS. *See Marubeni Am. Corp. v. United States*, 35 F.3d 530, 535 n. 3 (Fed. Cir.1994) ("Explanatory Notes are only instructive and are not dispositive or binding."). Given that the imports are articles that have enormous "make believe" or festive value at a particular time, either on Halloween or at a costume party where the wearer desires to mimic another, we conclude that the subject merchandise is classifiable as "festive articles" under subheading 9505.90.6000, HTSUS. *See Midwest of Cannon Falls, Inc. v. United States*, 122 F.3d 1423, 1429 (Fed.Cir.1997) ("In sum, all of the items at issue are used in celebration of and for entertainment on a joyous holiday, and they are all *prima facie* classifiable as 'festive articles' under heading 9505.").

The fact that the imported textile costumes "provide[ ] at least minimal decency and ... send[ ] the world a message about the wearer through their appearance or use" does not undermine Customs's interpretation. Nor do we believe that "[t]he

---

4. "Postiche" is defined as "false hair: as a: switch b: toupee." *Webster's Third New International Dictionary of the English Language, Unabridged* 1772 (1981).

5. Heading 6704, HTSUS, provides for "[w]igs, false beards, eyebrows and eyelashes, switches, and the like of human or animal hair, or of textile materials; articles of human hair not elsewhere specified or included."

fact that such garments may fail to constitute clothing worn by most on a daily basis" militates in favor of classifying the imported textile costumes as "wearing apparel." Affording the classification ruling the deference it is due under *Skidmore*, we see no reason to disturb Customs's determination. When the imported textile costumes are of a flimsy nature and construction, lacking in durability and generally not recognized as normal articles of wearing apparel, it is neither illogical nor unreasonable to conclude that the subject merchandise is classifiable as festive articles.

## IV. CONCLUSION

Mindful of Customs's specialized expertise in classifying imported articles, we conclude that textile costumes of a flimsy nature and construction, lacking in durability, and generally recognized as not being normal articles of apparel, are classifiable as "festive articles." Because Customs's classification ruling is persuasive and must be granted deference under *Skidmore*, the decision of the Court of International Trade holding that the subject merchandise be classified as "wearing apparel" is

*REVERSED.*

## V. COSTS

No costs.

BRYSON, *Circuit Judge*, dissenting.

I respectfully dissent.

This case turns on whether the subject costumes constitute "fancy dress, of textiles, of chapter 61 or 62" within the meaning of Note 1(e) to Chapter 95 of the Harmonized Tariff Schedule of the United States ("HTSUS"). I believe the Court of International Trade was correct in concluding that the costumes are articles of clothing constituting "fancy dress" within the meaning of that provision and that they are therefore excluded from classification in Chapter 95 and are properly classified in Chapter 61.

The two candidates for classification in this case are chapters 61 and 95 of the HTSUS. Chapter 61, which is part of Section XI ("Textiles and Textile Articles"), covers "Articles of Apparel and Clothing Accessories, Knitted or Crocheted." Note 1(t) to Section XI states that the section does not cover "Articles of chapter 95 (for example, toys, games, sports requisites and nets)." Chapter 95 covers "Toys, Games and Sports Equipment; Parts and Accessories Thereof." Note 1(e) to Chapter 95 states that the chapter does not cover "Sports clothing or fancy dress, of textiles, of chapter 61 or 62."

Given these directives, an article of "fancy dress" that is "of textiles" and otherwise falls within chapter 61 or 62 as an article of apparel is not classifiable under chapter 95. As the court notes, and as the trial court found, the term "fancy dress" refers to costumes that depart from conventional style and usually represent "a fictional or historical character, an animal, the fancy of the wearer, or a particular occupation." *Webster's Third New International Dictionary* 822 (1968). That definition plainly fits the costumes that are at issue in this case. It is also clear that the costumes are "of textiles." The only question is whether the costumes are "articles of apparel" that are classifiable in chapter 61 or 62.

On that issue, the court holds that the costumes at issue in this case are flimsy

and non-durable and therefore cannot be classified as "wearing apparel" classifiable under chapter 61 or 62. The court defers to the Customs Service's analysis on this point, finding it persuasive. I do not agree.

The Customs Service seeks to draw a distinction between "flimsy" costumes that a purchaser would expect to use only for a single event or a limited number of events, and "wearing apparel" that is used for decency, comfort, adornment or protection. Customs has ruled that costumes can constitute "wearing apparel" if they have characteristics such as zipper closures and certain styling features that are indicative of substantial and durable garments, but not if they are more crudely made or less durable. *See* HQ 961447 (July 22, 1998).

Even under the Customs Service's definition, the costumes that are at issue in this case are "wearing apparel," in that they can provide decency, comfort, adornment, and protection. I find no basis in the HTSUS for the distinction that Customs seeks to draw between "durable" costumes and "flimsy" ones. There is nothing in the common understanding of the term "wearing apparel" that suggests clothing that must be capable of many wearings in order to be considered "apparel," nor can any reasonably discernible line be drawn between garments that are well made and those that are crudely made or flimsy; some garments wear like iron, and some hardly seem designed to survive the first trip to the dry cleaner. Moreover, costumes by their nature are typically designed to be worn less frequently, or fewer times, than clothing that is intended for daily use. Nonetheless, the HTSUS clearly contemplates that costumes can constitute wearing apparel, inasmuch as Note 1(e) to chapter 95 refers to fancy dress

(i.e., costumes) made of textiles that constitute wearing apparel. If a costume can constitute wearing apparel—and it clearly can in the view of the HTSUS—I see nothing about the costumes at issue in this case that disqualifies them from being considered wearing apparel.

The Court of International Trade made findings that support this conclusion. First, the court examined the costumes at issue in this case and concluded that they were garments "which might be unusual, but would certainly not be indecent or too flimsy for a child to wear in warm weather." The court further found that the subject costumes

> are articles that are meant to adorn the human body at a particular time, either on Halloween or at any other event where the wearer desires to mimic another. They fall well within the norms of apparel as it is viewed in the United States; outer garments which provide[ ] at least minimal decency and which send[ ] the world a message about the wearer through their appearance or use.... The fact that such garments may fail to constitute clothing worn by most on a daily basis does not negate their inherent nature as articles of clothing.

In light of those factual findings, I cannot agree that the costumes in this case do not constitute wearing apparel.

Nor is there any suggestion in chapters 61 and 62 of the HTSUS that non-durable clothing is not "apparel." In fact, subheading 6210.10.50 of the HTSUS explicitly covers "disposable apparel designed for use in hospitals, clinics, laboratories or contaminated areas," and subheading 6210.10.70 covers "[d]isposable briefs and panties designed for one-time use." If those items are "apparel" even though intended for only a single use, then why does

the assertedly non-durable character of the costumes at issue in this case exclude them from being characterized as "apparel"? Customs does not explain that anomaly in its position. Disposable hospital gowns are not "durable" and do not feature zipper closures, finished collars, and styling features, yet they plainly constitute "apparel," as is made clear by their inclusion in chapter 62. The costumes in this case are entitled to the same treatment.

Finally, the Explanatory Notes to the Harmonized Commodity Description and Coding System make clear the distinction between textile costumes and other articles of fancy dress. The pertinent Note explains that heading 9505, in which Customs has classified the costumes at issue in this case, covers "Articles of Fancy dress, e.g., masks, false ears and noses, wigs, false beards and moustaches (not being articles of postiche—heading 67.04), and paper hats. However, the heading excludes fancy dress of textile materials, of Chapter 61 or 62." The Explanatory Note distinguishes between textile costumes ("fancy dress of textile materials") and costume accessories ("e.g., masks, false ears and noses, wigs, false beards and moustaches"). The costumes at issue in this case clearly fall on the textile costume side of that line. There is no suggestion in the Explanatory Note or elsewhere in the HTSUS that costumes made of textiles are normally characterized as "fancy dress of textile materials," but become akin to "masks, false ears and noses, wigs, false beards and moustaches" if Customs concludes that they are not as durable or well-finished as most imported wearing apparel. Customs' position in this case is not persuasive and therefore not entitled to deference. I would affirm the judgment of the Court of International Trade.